In the Matter of AN INQUIRY INTO AL-
LEGATIONS OF MISCONDUCT
AGAINST JUVENILES DETAINED AT
AND COMMITTED AT · CEDAR
KNOLL INSTITUTION, DEPART-
MENT OF HUMAN RESOURCES, et
al., Appellants.

No. 13855.

District of Columbia Court of Appeals.

Argued Nov. 30, 1979.

Decided May 12, 1981.

Leo N. Gorman, Asst. Corp. Counsel, with whom Louis P. Robbins, Acting Corp. Counsel and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., at the time the brief was filed, were on the brief, for appellants.

W. Anthony Fitch, Public Defender Service, with whom Silas J. Wasserstrom and A. Franklin Burgess, Public Defender Service, Washington, D. C., were on the brief, for appellees.

Abraham Dobkin, Washington, D. C., for appellee M. T. P.

Nancy J. Glassman, for appellee D. J. J.

Stephen A. Armstrong, Washington, D. C., for appellee K. A. V.

William J. Stone, with whom James R. Rosa, Washington, D. C., was on the brief, for amicus curiae, Local 383, American Federation of Government Emp., AFL–CIO.

Before NEWMAN, Chief Judge, and KELLY and FERREN, Associate Judges.

KELLY, Associate Judge:

The District of Columbia appeals from a comprehensive order mandating sweeping changes in the internal operation of the Children's Center, a residential complex for the care and treatment of juveniles, comprised of two facilities, Oak Hill and Cedar Knoll, and operated by the Social Rehabilitation Administration (SRA) of the Department of Human Resources of the District of Columbia Government (DHR). The order, issued August 7, 1978, was the culmination of a "special proceeding" in the Family Division of Superior Court in which the trial judge conducted a broad inquiry into allegations of mistreatment of juveniles detained and committed at the institution. We hold that the trial court was without jurisdiction to grant the relief contained in its final order since the four juveniles originally before the court were no longer in custody at the Children's Center on August 7, 1978, and there was no class action complaint brought on behalf of all juveniles detained and committed at Cedar Knoll and Oak Hill. Therefore, the order must be vacated.

I

During the period of September, 16–23, 1977, Judge Gladys Kessler presided as new referrals judge in the Juvenile Branch of the Family Division of Superior Court. In that capacity she conducted individual proceedings concerning the status of four juveniles who had been placed at the Cedar Knoll facility, which is used for detention of juveniles prior to delinquent proceedings and for confinement following delinquency adjudications.[1] Each of these four juve-

1. D.J.J., a male juvenile, born on June 11, 1969, was detained at Cedar Knoll on March 18, 1977, after being charged with robbery by force and violence in violation of D.C.Code 1973, § 22–2901. On May 3, 1977, D.J.J. was adjudicated delinquent and returned to Cedar Knoll pending disposition. On June 28, 1977, the SRA was ordered to place D.J.J. in a half-way house as soon as an opening occurred, and he was held at Cedar Knoll pending such an opening. On September 7, 1977, D.J.J. absconded from Cedar Knoll but voluntarily appeared with his attorney before Judge Kessler, on September 23, 1977, on a motion for appropriate placement. Judge Kessler sent D.J.J. to the receiving home for his own protection. And on September 30, 1977, because the SRA was unable to place D.J.J. in a half-way house, he was placed on aftercare status in the custody of his mother.

M.T.P., a male juvenile, born November 16, 1959, has been detained at Cedar Knoll three times in the past several years, most recently when on August 11, 1977, he was charged with breaking and entering and grand larceny, in violation of D.C.Code 1973, §§ 22–1801(b), –2201. On that date the new referrals judge ordered M.T.P. placed at Cedar Knoll, at the maximum level of security pending trial. On September 19, 1977, M.T.P. appeared before Judge Kessler on a motion to change the level of his detention. He alleged that he had been attacked and beaten by other juveniles at Cedar Knoll and for his own safety he was being detained at the Children's Center Hospital. Because he was "incoherent, weeping uncontrollably, and twitching spasmodically," Judge Kessler ordered placement at St. Elizabeths Hospital for a complete mental examination. On October 21, 1977, following a hearing, M.T.P. was released to his mother's custody pending trial on the grand larceny and breaking and entering charges. On May 25, 1978, those charges were dismissed.

K.A.V., a male juvenile, born November 12, 1962, was placed at Cedar Knoll on September 7, 1977, after a delinquency adjudication based on his unlawful entry of an elementary school in violation of D.C.Code 1973, § 22–3102. On September 14, 1977, he absconded from Cedar Knoll but was apprehended and presented before Judge Kessler on September 21, 1977. At that time he alleged he had been the victim of mistreatment while at Cedar Knoll, and he later so testified at hearings conducted by Judge Kessler. K.A.V. was returned to Cedar Knoll following his appearance before Judge Kessler, but he has since absconded from that facility and other court-ordered placements, and at the time of the final order in this proceeding he was not in custody at Cedar Knoll.

R.A. is a male juvenile, borne on June 22, 1968. On August 8, 1977, he was arrested for unlawful entry and on August 10, 1977, he was

niles alleged they were victims of serious mistreatment during their confinement at Cedar Knoll, which prompted Judge Kessler to initiate the "special proceeding" by issuing on September 26, 1977, an order, *sua sponte*, which stated in part:

> This Court has the authority to inquire into the conditions surrounding the detention and incarceration of juveniles who come before it. This Court also has the authority to issue all necessary orders in aid of its jurisdiction over juveniles. Upon hearing allegations of misconduct of this magnitude, especially when confirmed in two instances by Department of Human Resources personnel, this Court has a plain duty to discover what is happening to the children being sent, involuntarily and by order of this Division, to Cedar Knoll. If there is validity to what, at this point, are still unsworn and unproven charges, then the horror of what is happening to children at Cedar Knoll is almost beyond belief. But only a full and fair inquiry can establish one way or the other, whether there is any substance to these charges. . . . [Citations omitted.]

Judge Kessler directed a number of persons, including the four juveniles, their respective counsel, and administrators and employees of the Children's Center, to present testimony at a series of fact-finding hearings which were held on six days over the seven-month period from September 29, 1977 to April 14, 1978. Also on September 26, 1977, out of "a concern that factual issues might be presented which would prove to be beyond the investigatory resources of the four respondents' attorneys," Judge Kessler ordered the Public Defender Service (PDS) to "represent all juveniles detained and committed at Cedar Knoll" for purposes of the inquiry.

At the first of the hearings held before Judge Kessler, each of the four juveniles repeated their original allegations of mistreatment. They recounted incidents of physical abuse and sexual assaults by counselors; physical attacks and beatings by other juveniles which are allowed to occur because of inadequate supervision; drug abuse by both students and counselors and distribution of narcotics to students by counselors; administration of prescription drugs by untrained personnel; and, instances where juveniles who were clearly in need of medical attention were denied access to treatment by counselors. On the whole, the picture painted by these four juveniles was disturbing enough to shock even the most apathetic among our citizenry. For Judge Kessler, who in her role as new referrals judge in the Juvenile Branch had on occasion ordered young people confined at the Children's Center, these allegations were especially appalling, and so she continued her inquiry in earnest. The final order describes the next stages of the proceedings:

> Once it became clear that the testimony taken supported the initial allegations which had been made, the focus of the proceeding before the Court changed. Discovery was undertaken by PDS, extensive Answers to Interrogatories were filed, conferences were held between the parties so that factual material and joint proposals could be presented to the Court in the most coordinated fashion, and a number of Court hearings were held to explore the joint proposals submitted by the parties as well as their areas of disagreement.

As a result of this inquiry, on May 5, 1978 this Court issued a proposed Order which addressed all subject matter previously explored amongst the parties. At that time the Court published and widely circulated the proposed Order, and requested comments on the Order.[2] After

---

detained pending trial first at the receiving home and then at Cedar Knoll. R.A. absconded from Cedar Knoll and on September 19, 1977, a custody order was issued for his return. On that date, he appeared before Judge Kessler and was ordered to the receiving home pending his next hearing. On January 10, 1978, the

charges against R.A. were dismissed upon motion by the government.

**2.** In addition to receiving comments on the proposed order from the Corporation Counsel, DHR, PDS and various citizens groups, Judge Kessler directed that the proposed order be

careful consideration of each of the submissions received, and of further submissions from the Department of Human Resources and the Public Defender Service, the Court [then entered its] final Order in this action. [Order of Aug. 7, 1978, p. 1 & 2.]

On August 17, 1978, the District of Columbia filed a notice of appeal in this court and a motion in Superior Court to stay the August 7, 1978 order pending judicial review. The PDS filed an opposition to the motion for a stay on August 23, 1978, and a reply to the opposition was filed on August 29, 1978. On September 1, 1978, Judge Kessler denied the motion for a stay. That same day the District of Columbia filed a motion in this court for a stay pending appeal. We originally granted the stay on September 6, 1978, and subsequently ordered that it remain in effect pending oral argument on the motion which was held on September 28, 1978. The day after argument we remanded the record for entry of specific findings of fact and conclusions of law as to the jurisdiction of the trial court and the reasons for issuance of the order of August 7, 1978. We also ordered that the stay remain in effect pending further order. On October 30, 1978, we received Judge Kessler's findings of fact and conclusions of law, dated October 27, 1978. Oral argument was heard by the panel on November 30, 1979.

## II

The District of Columbia appeals on two grounds: first, that the trial court was without jurisdiction to issue the order, and secondly, that the order is not justified by the evidence adduced at the hearings. Since we hold the order did exceed the jurisdiction of the trial court, we need not determine whether the specific terms of the order are appropriate in light of the evidence. Nevertheless, for purposes of this appeal it is useful to summarize the details of Judge Kessler's order.

In brief, the order requires the DHR to adopt and implement, within 30 days, detailed procedures and standards relating to evaluating and processing complaints of staff abuse and mistreatment of children, including reassignment of staff members pending investigation; to submit to the court a detailed description of a plan for training all cottage counselors, and other staff, in emergency first aid; to submit a detailed explanation of plans for transporting juveniles with medical emergencies; and to submit recommendations concerning nursing staff requirements at the facilities so that the court can issue a final order concerning the employment of nursing personnel. The Department is also directed to cease administering psychotropic drugs or other prescription medication, except under orders of a doctor, with consent of the child's parents in the case of psychotropic drugs. In addition, detailed reports of the administration of such medications are to be maintained and made available to the court. The Department is to submit a plan for identifying and caring for children experiencing emotional illnesses and is not permitted to segregate children experiencing emotional or mental problems except under specific written orders of a doctor, with notice provided to the child's parents and counsel.

The order sets specific staff/child ratios and requires DHR to submit to the court a detailed pre-service and in-service training curriculum for cottage counselors and other staff members, with at least sixty hours of pre-service training and forty hours of in-service training in each years of service thereafter. The DHR is also to upgrade the position of cottage counselor and revise the employment criteria for that position. The DHR is to select from among three alternatives offered by the court for providing adequate protection from physical and sexual abuse for children housed in dormitories at Cedar Knoll. The DHR is required to submit a detailed proposal within forty-

printed in the Daily Washington Law Reporter and solicited comments from any interested persons in the community, "so that the court

may have the benefit of the broadest possible spectrum of views on the subject." (Proposed Order, May 5, 1978, p. 2.)

five days for remedying critical "staffing level inadequacies" and to explain the present use of overtime as a substitute for hiring additional staff. Finally, the DHR is to submit to the court within ninety days a "detailed proposal for the establishment of a comprehensive plan for each child committed to Cedar Knoll or Oak Hill," including, *inter alia*, proposals for a "comprehensive screening procedure, the differentiation of cottages, the creation of an institutional progress system, and the reevaluation of each juvenile before release."

### III

▓ Without a doubt the terms of Judge Kessler's order come very close to creating a situation where administration of the Children's Center is in the hands of the Judicial Branch. While some assumption of an executive function is not entirely unique in the context of remedial orders arising out of litigation concerning juvenile facilities, *see In re Savoy*, 98 Wash.D.L.Rep. 1937 (Oct. 30, 101 Wash.D.L.Rep. 317 (Feb. 20, 1973); *Morales v. Turman*, 383 F.Supp. 53 (E.D.Tex.1974); *Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 4 L.Ed.2d 1146 (1974); *Inmates of Boy's Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I.1972); Swanger, "Juvenile Institutional Litigation" Clearinghouse Review, Vol. 11, No. 1, p. 219 (July 1977), the constitutional doctrine of the separation of powers mandates that such relief not be too readily resorted to. Under our tripartite system of government, courts must be careful not to encroach on the prerogatives of another department of the government. *United States v. Shaw*, D.C.App., 226 A.2d 366 (1967); *United States v. Foster*, D.C.App., 226 A.2d 164 (1967). At the very least there must be no question as to the court's jurisdiction to act in the particular case.

▓ In the case at bar, jurisdiction is assertedly based upon the presence before the court of four juveniles who at the time they appeared were confined at the Children's Center. We begin our analysis with a review of the precedents in this jurisdiction for a judicial inquiry into the conditions under which juveniles are confined. In *Creek v. Stone*, 126 U.S.App.D.C. 329, 379 F.2d 106 (1967), a juvenile challenged his confinement at the receiving home pending final disposition by filing a habeas corpus petition alleging he was not being furnished the care and treatment he required. The Court of Appeals held that the juvenile court could not refuse to consider on the ground of lack of jurisdiction the juvenile's allegations, deciding that the statute, D.C.Code 1966 Supp., § 16–2316(3), established "not only an important policy objective, but in an appropriate case, a legal right to custody which is not inconsistent with the *parens patriae* premise of the law." *Id.* at 334, 379 F.2d at 111. The language of the statute on which *Creek v. Stone* was based was not included in the 1970 Revision of Title 16; however, the standard, that the court will "secure for [the child] custody, care and discipline as nearly as possible equivalent to that which should have been provided for him by his parents," survives in Super.Ct.Juv.R. 2. We can assume, as the trial court did, without deciding, that the standard as contained in Rule 2 is applicable in the instant case with the same force as the statutory standard in *Creek v. Stone*.

This "equivalent treatment" standard was the basis for the order in *In re Savoy*, 98 Wash.D.L.Rep. 1397 (Oct. 30, 1970), in which Judge Harold H. Greene held that because the receiving home was not a suitable place of detention the Superior Court would no longer authorize detention at that facility of any child after October 13, 1972. *Savoy*, which began as a motion for release brought on behalf of children confined at the receiving home, was the principal case relied on by the trial court in asserting its jurisdiction in this case. Putting to one side the fact *Savoy* is not binding on this court, we hold it does not provide authority for asserting there was jurisdiction to issue the order challenged in this case because none of the four juveniles were confined at

Cedar Knoll at the time the order was issued.[3]

It is clear from *Creek v. Stone*, and subsequent cases, that the court's duty, "when presented with a substantial compliant" to make "an appropriate inquiry to insure that the statutory criteria ... are being met," contemplates an inquiry regarding the confinement of a particular individual or individuals. *In re Elmore*, 127 U.S.App.D.C. 176, 382 F.2d 125 (1967); *Fulwood v. Stone*, 129 U.S.App.D.C. 314, 394 F.2d 939 (1967). The complaint of one or two, or even four juveniles, does not give the court license to undertake a broad and detailed inquiry into the operation of the entire facility. In this case, since the four juveniles alleging mistreatment were no longer confined at Cedar Knoll when the order was issued, the order cannot be premised on the court's obligation to insure their confinement conformed to the applicable standard. That issue, as regards the four juveniles, was moot by the time of the order granting relief. *Creek v. Stone, supra*, 126 U.S.App.D.C. at 335, 379 F.2d at 112; *see Brown v. Yeldell*, 159 U.S.App.D.C. 339, 487 F.2d 1210 (1973); *Clayton v. Stone*, 123 U.S.App.D.C. 181, 358 F.2d 548 (1966) (appeal from dismissal of habeas corpus petition requesting release from receiving home dismissed as moot after juvenile released in custody of maternal grandmother); *Elmore v. Stone*, 122 U.S. App.D.C. 416, 355 F.2d 841 (1966) (serious allegations raised in petition for habeas corpus relief rendered moot after court released petitioner in his father's custody).

We emphasize that our holding that this broad remedial order cannot be bootstrapped onto jurisdiction over the four juveniles is not the result of a mere technical requirement. It is axiomatic that our judicial system is based upon the adversary process. A fundamental part of the process is that parties in a judicial proceeding must have a concrete stake in the outcome. *See Simon v. Eastern Kentucky Welfare Rights*

*Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Rizzo v. Goode*, 423 U.S. 362, 371–73, 96 S.Ct. 598, 604–05, 46 L.Ed.2d 561 (1976); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Given that none of the four juveniles whose allegations of mistreatment were the genesis of this proceeding was in custody at Cedar Knoll in August 7, 1978, none had a personal stake in the outcome at that point, and the relief contained in the order cannot be said to have been for their benefit.

### IV

Since jurisdiction to render the order cannot rest upon the court's duty to act on behalf of any of the four named juveniles, we must determine whether the trial judge ever acquired jurisdiction to act on behalf of the other group of juveniles whom she intermittently referred to as the plaintiffs: "All juveniles detained or committed at the Children's Center." That determination is speedily resolved under Super.Ct.Civ.R. 23 and 23I. Under those rules, a class, which "all juveniles" clearly is, must share a legal controversy and be represented in court by a member of the class whose claims are typical of other persons in the class, and who himself has standing to bring the action. *See generally* 1 Newberg, Class Actions 69, § 1030 (1977). No such findings were made at any point in this proceeding. Furthermore, none of the prerequisites for pretrial certification of the class were complied with. *See Apartment and Office Building Association of Metropolitan Washington v. Washington*, D.C.App., 343 A.2d 323 (1975); *Dorfmann v. Boozer*, 134 U.S. App.D.C. 272, 275 n.8, 414 F.2d 1168, 1171 n.8 (1969). Absent even rudimentary trial level attempts to comply with Rule 23 (or even mention of a class action at the hearings), we cannot, on appeal, rewrite the procedural history of this case.[4]

---

**3.** *See* note 1 *supra.*

**4.** Even if the four individual juveniles had been named plaintiffs in a class action, dismissal of their cases prior to certification of the class would ordinarily make the entire class action moot. *See United States Parole Commission v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

As the United States Court of Appeals stated in *Creek v. Stone, supra* at 126 U.S. App.D.C. 334, 379 F.2d at 111, "[W]e do not administer the receiving home." It should be equally evident that the Superior Court does not administer the Children's Center. Although the court has the authority to issue an order tailored to insure appropriate confinement for parties properly within its jurisdiction, it is apparent that the order appealed from, although clearly well-intentioned, was in excess of the court's jurisdiction. Therefore, the order is to be vacated and the case dismissed.

*So ordered.*

FERREN, Associate Judge, dissenting:

I respectfully dissent from my colleagues' conclusion that this case is moot. At the time Judge Kessler entered her order, the court still had jurisdiction over two of the four original parties, D.J.J. and K.A.V. Nothing of record since has changed that situation. Accordingly, this court is obliged to evaluate whether the juvenile court has authority to mandate changes at the Children's Center on the ground that they were reasonably needed for the "supervision, care, and rehabilitation" of these two children. D.C.Code 1973, § 16–2320(c).

I have no doubt that the juvenile court has authority to require the types of relief Judge Kessler ordered. However, in the absence of a certified class action covering all the children at the Center, the court must fashion such relief solely by reference to the needs of the particular parties before

the court. I agree with my colleagues that the scope of Judge Kessler's order—clearly intended as class relief—appears to be too broad. It is not possible to determine whether all the provisions were justified by reference to D.J.J.'s and K.A.V.'s own situations, or were added to the order in response to afflictions alleged by others. Accordingly, I would reverse and remand the case for further proceedings to determine what relief is reasonably necessary for D.J.J. and K.A.V. If the court were to reconfirm the need for changes at the Children's Center, based on detailed findings applicable to these two children, the court would have authority to order that relief.

I.

No one disputes that during the period September 16–23, 1977, before Judge Kessler began her comprehensive inquiry into the Children's Center, she presided over four juvenile proceedings, all properly conducted under the statutes and rules governing jurisdiction of the Juvenile Branch of the Superior Court. Specifically, D.J.J. appeared on motion for appropriate placement based on the Social Rehabilitation Administration's (SRA)'s continuing failure to provide halfway house placement as originally ordered. *See* Super.Ct.Juv.R. 32(h).[1] In contrast, M.T.P. sought review of his level of detention at Cedar Knoll—a motion equivalent to an application for modification of his detention order. *See* D.C.Code 1978 Supp., § 16–2324(b); Super.Ct.Juv.R. 107(c).[2] Judge Kessler, accordingly, had to

1. Super.Ct.Juv.R. 32(h) provides:

   REVIEW OF DISPOSITION. If the disposition order involves placement of the child in an institution, hospital, or agency upon specified conditions, upon request of counsel for the child or Corporation Counsel, the Division shall order that a report concerning implementation of the stated conditions be filed with the Division within 30 days after entry of the dispositional order, and a copy sent to counsel. If such report does not reflect full implementation of the original dispositional order, counsel for the child may request that the Division set a date for a prompt hearing and order notice sent to all parties, including the institution, hospital or agency in whose

custody the child was placed by the dispositional order.

As noted in the comment to Rule 32, "[s]ection (h) is designed to provide a means of determining whether dispositional orders are in fact implemented." This was precisely D.J.J.'s problem.

2. D.C.Code 1978 Supp., § 16–2324(b) provides:

   A child who has been committed under this subchapter to the custody of an institution, agency, or person, or the parent or guardian of the child, may file a motion for modification or termination of the order of commitment on the ground that the child no longer is in need of commitment, if the child or his parent or guardian has applied to the institu-

consider the propriety of M.T.P.'s continued confinement, given the conditions prevailing at Cedar Knoll. *See* Lawton, *Juvenile Proceedings—The New Look*, 20 Am.U.L. Rev. 342, 365–66 (1970–71).[3] Finally, because K.A.V. and R.A. had absconded from Cedar Knoll, both were appropriately before the court for consideration of resumed detention there. *See* D.C.Code 1973, § 16–2312.

## II.

My colleagues state that because none of the juveniles originally before the trial court was incarcerated at Cedar Knoll by the time Judge Kessler issued the order granting relief, their cases were moot. I disagree. It is true that by the date of the order, August 7, 1978, the government had dismissed all charges against M.T.P. (May 25, 1978) and R.A. (January 10, 1978), and thereby had eliminated a justiciable controversy as to each of them. *See Banks v. Ferrell*, D.C.App., 411 A.2d 54, 55–56 (1979). The court, however, still had jurisdiction over D.J.J. (who had aftercare status in the custody of his mother) and K.A.V. (who had absconded but was subject to an outstanding custody order to return to the Children's Center). *See* D.C.Code 1973, § 16–2303.[4]

> tion or agency for release and the application was denied or not acted upon within a reasonable time.

**3.** *Compare In re J.M.W.*, D.C.App., 411 A.2d 345, 349 n.4 (1980) (Although Corporation Counsel lacks statutory authority to request review of a juvenile's aftercare status, "we are not called on to consider the applicability of or authority given to the Court by any other provisions of Title 16 of the D.C.Code or any other provision of the D.C. statutes and thus, we do not do so. Our holding is limited to the narrow issue presented by this record").

**4.** In *In re Lem*, D.C.Mun.App., 164 A.2d 345, 348 (1960), we said: "We feel that Congress, realizing that the needs and welfare of a child committed under any conditions fluctuate rapidly, intended that the court have continuing jurisdiction in all child commitment cases in which it had original jurisdiction."

**5.** The likelihood that the authorities will apprehend K.A.V. *and return him to Cedar Knoll* is real enough to sustain an "adjudicable case or controversy." *Molinaro v. New Jersey*, 396

The fact that these two children no longer were at Cedar Knoll did not remove the conditions of that facility from the court's legitimate concern. Once apprehended K.A.V. would be returned to Cedar Knoll in the normal course of events.[5] Similarly, because of the District's inability to place D.J.J. in a halfway house, Cedar Knoll was the facility where the court normally would order placement; aftercare status in the custody of D.J.J.'s mother was a second choice because of the unacceptable conditions at Cedar Knoll. Thus, Judge Kessler placed D.J.J. on aftercare status not because she thought this was appropriate but because, given the conditions at Cedar Knoll, she concluded she had no choice.[6]

In calling this case moot, my colleagues would force the trial court into the untenable position of either having to place a child in an inhumane facility while ordering the conditions improved, or of removing the child and allowing the conditions that forced the removal to go uncorrected. The law on mootness does not go that far. In an analogous context, for example, the Supreme Court held that a suit charging state officials with harassment of union organizing activities was not mooted by the fact

U.S. 365, 366, 90 S.Ct. 498, 499, 24 L.Ed.2d 586 (1970) (per curiam); *see Eisler v. United States*, 338 U.S. 189, 190, 69 S.Ct. 1453, 1454, 93 L.Ed. 1897 (1949) (per curiam) (review of cause postponed but not dismissed, pending escaped fugitive's return).

**6.** Judge Kessler stated in her findings of fact:

On September 23, 1977, D.J.J. appeared before this Court, sitting in New Referrals, on a Motion for Appropriate Placement because of SRA's failure to comply with the Order of June 28, 1977 to place him in a half-way house. Counsel for D.J.J. alleged that he had absconded from Cedar Knoll because of numerous sexual assaults on him by a counselor, and requested an immediate safe placement. The allegations of sexual assault were not denied by the Cedar Knoll Administration. This Court then sent D.J.J. to the Receiving Home for his own safety, and on September 30, 1977, because of SRA's continuing inability to place him in a half-way house, placed him on Aftercare status in the custody of his mother.

that the union had been forced to abandon its organizing effort as a result of the very harassment that served as the basis of the suit. *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974). The Court reasoned, "There can be no requirement that appellees continue to subject themselves to physical violence and unlawful restrictions upon their liberties throughout the pendency of the action in order to preserve it as a live controversy." *Id.* at 810, 94 S.Ct. at 2197. Here, as well, D.J.J. and K.A.V. should not have been forced to stay at Cedar Knoll in order to sustain this controversy.

Beyond the practical dilemma that my colleagues' approach to mootness creates, several factors combine to keep this case very much alive. First, as to D.J.J. and K.A.V., this is not a case where a child has completed his or her assignment to Cedar Knoll. *See Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam) (prisoner challenging parole procedures unconditionally released from supervision before oral argument); *cf. Banks, supra* at 56 (prisoner challenging D.C. Parole Board proceeding no longer held in jurisdiction). Nor, as to D.J.J. and K.A.V., is this a case where a child has been conditionally released from Cedar Knoll because of improvement while in custody, or for any other reason leading the trial court

to conclude that confinement no longer was necessary for the child's welfare.[7] Accordingly, although D.J.J. and K.A.V. are not presently held at Cedar Knoll, there is every reason to anticipate that both of them—still under court supervision—will confront the prospect of returning, once again, to Cedar Knoll as the only available alternative. *See Vitek v. Jones,* 445 U.S. 480, 487 & n.5, 100 S.Ct. 1254, 1260 & n.5, 63 L.Ed.2d 552 (1980).

Second, this is not a case where "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not be expected to recur...." *Campbell v. McGruder,* 188 U.S.App.D.C. 258, 277–79, 580 F.2d 521, 540–42 (1978) (quoting *United States v. Concentrated Phosphate Export Ass'n Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)) (citations omitted) (building of new jail facility did not make claims respecting the conditions of the old jail moot). There is no suggestion in this case that the District voluntarily has ended the conditions found wanting at Cedar Knoll. *See County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *Concentrated Phosphate Export Ass'n Inc., supra,* 393 U.S. at 203, 89 S.Ct. at 364; *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953). Thus, it

7. The cases on mootness cited by my colleagues appear to fall into these categories. *See Brown v. Yeldell,* 159 U.S.App.D.C. 339, 487 F.2d 1210 (1973); *Creek v. Stone,* 126 U.S. App.D.C. 329, 379 F.2d 106 (1967) (per curiam); *Clayton v. Stone,* 123 U.S.App.D.C. 181, 358 F.2d 548 (1966); *Elmore v. Stone,* 122 U.S.App. D.C. 416, 355 F.2d 841 (1966). In *Brown,* the juvenile's two-year commitment had expired by the time the case reached the appellate court. In *Creek,* the juvenile was transferred from the challenged pretrial detention facility to detention in a different facility following a finding of involvement. *Clayton* and *Elmore* reflect a change from the challenged pretrial detention to pretrial custody in a parent—for all that appears of record a court-preferred alternative.

The fact that several earlier challenges to the conditions at Cedar Knoll have been dismissed as moot, moreover, cuts two ways. In a separate statement in *Clayton,* Judge Bazelon noted: "If a substantial and recurring issue is repeatedly mooted before it can be adjudicated

a federal court is not without power to decide the issue in an appropriate case." *Id.* 123 U.S. App.D.C. at 182, 358 F.2d at 549 (citations omitted). Traditionally, the Supreme Court has not declared cases moot which are "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). *See Weinstein, supra* 423 U.S. at 148, 96 S.Ct. at 348; *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 125–26, 94 S.Ct. 1694, 1699–1700, 40 L.Ed.2d 1 (1974) ("It is sufficient therefore, that the litigant show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest"). Where the short-term nature of state action—here, the juveniles' brief encounter with Cedar Knoll—is often shorter than necessary for the judicial process to run its course, but the policy underlying that action continues to affect the public, the courts should not declare the case moot.

not only is likely that the children will confront the prospect of returning to Cedar Knoll but also, if and when they do, they will confront the same conditions that forced their removal in the first place.

Finally, given the extraordinary amount of time and effort by all parties—including the District—to facilitate this litigation, the "public interest in having the legality of the practices settled, militates against a mootness conclusion." *W.T. Grant Co., supra* at 632, 73 S.Ct. at 897. This court should not avoid its responsibility to the parties or the public by mechanically applying the mootness doctrine to duck the hard question of what to do about Cedar Knoll. This controversy remains a live one, and we should resolve it.

### III.

The District challenges the court's power to initiate an inquiry into conditions at the Children's Center—and to order comprehensive relief—based on allegations and findings derived from individual juvenile proceedings. In making this argument, however, the District confronts the broad authority of the Juvenile Branch to provide for the general well-being of the children over whom it has jurisdiction. Juvenile judges have a responsibility to determine, for example, whether legal custody of a child found delinquent or in need of supervision should be transferred from a parent or guardian to a public agency.[8] The impact of such a decision on a young life can hardly be overestimated.

Specifically, the juvenile judge has the responsibility at the time of disposition to seek "supervision, care, and rehabilitation" for the child. D.C.Code 1973, § 16–2320(c); *see* note 8 *supra*. The objectives of the juvenile court "are to provide measures of guidance and rehabilitation for the child . . . ." *Kent v. United States*, 383 U.S. 541, 554, 86 S.Ct. 1045, 1053, 16 L.Ed.2d 84 (1966). *Accord, Black v. United States*, 122 U.S.App.D.C. 393, 394, 355 F.2d 104, 105 (1965); *Pee v. United States*, 107 U.S.App. D.C. 47, 49–50, 274 F.2d 556, 558–59 (1959); *In re Poff*, 135 F.Supp. 224, 225–26 (D.D.C. 1955). Although juveniles are now afforded procedural rights substantially similar to those afforded adult offenders, *see In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d

**8.** D.C.Code 1973, § 16–2320(c) prescribes the range of dispositional alternatives:

> If a child is found to be delinquent or in need of supervision, the Division may order any of the following dispositions for his supervision, care, and rehabilitation:
>
> (1) Any disposition authorized by subsection (a) (other than paragraph (3)(A) thereof).
>
> (2) Transfer of legal custody to a public agency for the care of delinquent children.
>
> (3) Probation under such conditions and limitations as the Division may prescribe.

The available dispositions authorized by § 16–2320(a) (as amended, D.C.Code 1978 Supp., § 16–2320(a)) are:

> (1) Permit the child to remain with his parent, guardian, or other custodian, subject to such conditions and limitations as the Division may prescribe, including but not limited to medical, psychiatric, or other treatment at an appropriate facility on an out-patient basis.
>
> (2) Place the child under protective supervision.
>
> \*   \*   \*   \*   \*   \*
>
> (4) Commitment of the child for medical, psychiatric, or other treatment at an appropriate facility on an inpatient basis if, at the dispositional hearing provided for in section 16–2317, the Division finds that confinement is necessary to the treatment of the child. A child for whom medical, psychiatric, or other treatment is ordered may petition the Division for review of the order thirty days after treatment under the order has commenced, and, if after a hearing for the purpose of such review, the original order is affirmed, the child may petition for review thereafter every six months.
>
> (5) The Division may make such other disposition as is not prohibited by law and as the Division deems to be in the best interest of the child. The Division shall have the authority to (i) order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within such agency's legal authority and (ii) order any private agency receiving public funds for services to families or children to provide any such services when the Division deems it is in the best interests of the child and within the scope of the legal obligations of the agency.
>
> (6) Terminate the parent and child relationship for the purpose of seeking an adoptive placement for the child pursuant to subchapter III of this chapter.

527 (1967), these procedural protections have not altered the court's role as *parens patriae* in fashioning dispositions. *See id.* at 27, 87 S.Ct. at 1443.

As a standard to guide juvenile judges, Super.Ct.Juv.R. 2 commands that "when a child is removed from his own home, the Division will secure for him custody, care and discipline as nearly as possible equivalent to that which should have been provided him by his parents."[9] The dispositional orders committing K.A.V. and D.J.J. to SRA custody expressly acknowledged that standard.

If a juvenile judge is properly to review the disposition of a child who questions the conditions of detention—as Judge Kessler was required to do in each of the cases before her—the court must have broad authority to inquire into the suitability of the facility for that particular child. *See In re Elmore*, 127 U.S.App.D.C. 176, 177–78, 382 F.2d 125, 126–27 (1967); *cf. Welfare of J.E.C. v. State*, 302 Minn. 387, 400, 225 N.W.2d 245, 253 (1975) (before referring child for adult prosecution, trial court must inquire into the alleged inadequacy of available juvenile treatment programs).

The Juvenile Court, when presented with a substantial complaint, should make an appropriate inquiry to insure that the statutory criteria, as applied to that particular juvenile, are being met. The depth and scope of such an inquiry will vary with the case. In some instances a hearing may not be necessary; in others the court may have a need for the assistance and enlightenment which an evidentiary hearing affords. In any such case the Juvenile Court may, of course, appropriately consider the safety of the community together with the juvenile's needs. What it may not do, is to refuse to consider the matter at all on the ground of lack of jurisdiction. [*Creek v. Stone*, 126 U.S.App.D.C. 329, 334, 379 F.2d 106, 111 (1967) (footnote omitted).]

Only a compatible match of child and placement can meet the rehabilitative purpose of a juvenile proceeding. The focus of the judge's inquiry, therefore, must be not only on the child involved but also on whether the facility itself is adequate for care and rehabilitation. *See Fulwood v. Stone*, 129 U.S.App.D.C. 314, 318–19, 394 F.2d 939, 943–44 (1967) (per curiam); *Creek, supra* 126 U.S.App.D.C. at 333–35, 379 F.2d at 109–11; *Benton v. Reid*, 98 U.S.App.D.C. 27, 29–30, 231 F.2d 780, 782–83 (1956).

It follows that the Juvenile Branch has jurisdiction to inquire into alleged abuses and to order whatever relief is reasonably necessary to achieve the minimum conditions required for the District to meet its statutory responsibilities to the particular child before the court. The fact that other juveniles who are not before the court may also benefit is no basis to say that such jurisdiction does not exist. The court's power to help a person is not lost because another person is helped as a consequence.[10]

9. The rule thus embodies the standard set by the predecessor to the present statute, which provided:

When the child is removed from his own family, the court shall secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given him by his parents. [D.C.Code 1967, § 16–2316(3).]

I agree with former Chief Judge Greene of the Superior Court, who has stated:

While the language of the statute has been altered since 1970, its meaning remains the same. D.C.Code § 16–2313(b), as amended in 1970, provides that a child who is alleged to be delinquent "may be detained ... only" in an institution designated by the Court, including an "appropriate" facility operated by the District. The statutory requirements of appropriateness and of certification by the Court clearly perpetuate previously existing statutory standards, and nothing in the legislative history indicates that a departure from those standards was intended. See also, Rule 2 of the Rules of the Juvenile Branch of the Superior Court ... [*In re Savoy*, No. J–4808–70 (D.C.Super.Ct., Jan. 12, 1973).]

10. The District does not argue that, in the event the juvenile court has jurisdiction to order relief affecting Children's Center operations, there is a way to limit the court's protections to the particular juveniles before the court. Implicitly, the District accepts that if the juvenile court has jurisdiction to mandate changes at the Children's Center, its order—within proper bounds—will extend protection to all children there.

Persuasive precedent supports such inquiry and relief. In *In re Savoy*, Nos. 70–4808, 70–4714 (D.C.Super.Ct., Oct. 13, 1970), 98 Wash.D.L.Rptr. 1937 (Oct. 30, 1970), two juveniles filed a motion for release "on the ground that the receiving Home for Children, where they are being held, is not an acceptable home substitute, or for such other relief as may be appropriate." Former Chief Judge Harold Greene conducted an inquiry into conditions at the Receiving Home. The children alleged that the educational, recreational, and medical facilities were so inferior to those available in other juvenile facilities, or in the community outside, that the Receiving Home did not provide an adequate home substitute. They also challenged the punitive use of isolation rooms. The court ordered additional hours of instruction, despite the fact that additional staff would have to be hired and the student population limited in order to achieve the court's goals. The court also ordered increased use of recreational equipment, as well as instruction and counseling for residents placed in isolation. The court concluded, however, that these measures still would not bring the Receiving Home up to the level of an acceptable home substitute. The court accordingly decided that it no longer would be justified in ordering, or even authorizing, detention of juveniles at the Receiving Home, beginning two years hence. In effect, this forced the District to construct a new facility.[11] *Cf. United States v. Alsbrook*, 336 F.Supp. 973 (D.D.C.1971) (in aid of its sentencing power in the case of a particular defendant, the court ordered District and federal officials to provide both emergency and long-term plans to alleviate congestion in facilities used for dispositions under the Youth Corrections Act).

The present case is similar. After properly inquiring into whether the court justifiably could rely on SRA's use of the Children's Center to house, care for, supervise, and rehabilitate the four juveniles—and having found it unsuitable for their present use—Judge Kessler ordered alternative, individual dispositions[12] while retaining jurisdiction over each juvenile, *see* D.C.Code 1973, § 16–2303; note 4 *supra,* and pursuing the question of an appropriate longer-term placement for each at the Children's Center.[13]

One question, therefore, remains: Whether the relief ordered by Judge Kessler was reasonably necessary to assure the proper "supervision, care, and rehabilitation" of each child properly before her. D.C.Code 1973, § 16–2320(c).

### IV.

A. I agree with my colleagues that a class action is a more suitable vehicle for

---

**11.** In two subsequent opinions, Chief Judge Greene followed through on problems surrounding the implementation of the original order and other allegations concerning care at the Receiving Home. *See In re Savoy*, No. J–4808–70 (D.C.Super.Ct., Jan. 12, 1973, Nov. 3, 1976).

The judge premised jurisdiction to order such broad relief on D.C.Code 1967, §§ 11–1526, –1584, and 16–2316(3) and his view that "[t]he Juvenile Court is in the nature of a court of equity." I perceive no greater jurisdiction in the juvenile court under the 1967 Code, before court reorganization, than it has now; and it is indisputable that the Family Division of Superior Court exercises equitable powers.

**12.** D.J.J. was placed on aftercare status in the custody of his mother on September 30, 1977. K.A.V. remained in SRA custody after his September 21, 1977 hearing, although Judge Kessler's order states that he had absconded as of July 27, 1978 and will be returned to the Children's Center when apprehended. M.T.P. was released to the custody of his mother on October 21, 1977; the charges against him were dismissed on May 25, 1978. Judge Kessler transferred R.A. to the Receiving Home on September 19, 1977; charges were dismissed on January 10, 1978.

**13.** Given the court's continuing jurisdiction over each child with the corresponding responsibility to arrange for stable, longer-term care and supervision, it is irrelevant that the court may have been able to find other suitable, shorter term placements pending rehabilitation of the District's principal juvenile facility. The fact remains that Judge Kessler had an ongoing responsibility to inquire into the dispositional needs and situations of the juveniles before her, and that all of them implicated the suitability of the Children's Center, where each had been assigned earlier by court order.

scrutinizing a situation like the Children's Center where relief can be directed, without hesitation, for the benefit of all members of the class, not just individuals, and where mootness problems are not likely to arise. But I cannot agree that the greater suitability of one approach can serve to erase jurisdiction that otherwise is there.[14] The availability of Super.Ct.Civ.R. 23 and 23I governing class actions cannot diminish the equitable jurisdiction of a Juvenile Branch judge under D.C.Code 1973, § 16–2320.

Accordingly, there is only one significant difference between Judge Kessler's authority in this case and the authority she would have had if this proceeding had begun as a class action: here, the order directed to the Children's Center must be reasonably necessary to achieve the court's statutory responsibilities to assure proper "supervision, care, and rehabilitation," D.C.Code 1973, § 16–2320(c), of the particular children who are parties before the court. It cannot be justified by reference to the needs of other children (as it could be when individual parties are class representatives).

This "reasonably-necessary-for-particular children" standard is, of course, imprecise. When coupled with an abuse-of-discretion standard for appellate review, it would grant considerable leeway to the trial judge. Therefore, given the potential scope of judicial interpretation, as well as the need for appropriate sensitivity to the prerogatives of the executive branch of the District government, I would require a judge who proposes to issue a sweeping order to justify it with precision, through detailed findings directed at the necessity for such relief for the particular child concerned. Under this theory of the scope of relief, it would have to be clear that all other children are but incidental beneficiaries.

B. I turn now to Judge Kessler's order. I agree with the District that in evaluating whether judicial relief of the sort ordered here is reasonably necessary to assure adequate supervision, care, and rehabilitation of particular children, the court should be mindful of the efforts of the executive branch already in progress to respond to the abuses claimed, such that the risk of future violations will be substantially reduced. *Washington Free Community, Inc. v. Wilson*, 157 U.S.App.D.C. 360, 366–68, 484 F.2d 1078, 1084–86 (1973); *Long v. District of Columbia*, 152 U.S.App.D.C. 187, 192, 469 F.2d 927, 932 (1972). In this connection, the District has forthrightly acknowledged a number of the abuses and has negotiated with appellees' counsel over a period of many hours, in good faith, toward a resolution of this case. All the parties are to be commended for this effort.

Until this appeal, in fact, the District did not challenge the jurisdiction of the Juvenile Branch to conduct the inquiry and enter the type of order at issue here. Moreover, although the District registered objections with Judge Kessler to several provisions (not relevant here) of appellees' proposed order—and also commented on the court's proposed order—those responses do not reflect any objection to the only two remedial provisions of the final order specifically challenged on appeal: one requiring removal of staff workers from contact with children pending resolution of complaints against them, another limiting to doctors, nurses, and paramedics the administration of prescription medications.[15] Thus, we have a situation in which the court had encouraged the parties, to the extent possible, to agree with a remedial order, without any concern of record by the District that the court lacked authority, or

---

14. In *Vitek, supra*, on the basis of an individual complaint, the Supreme Court declared unconstitutional state procedures for transferring and committing prisoners to mental hospitals. The case originally had been brought as a class action, but the District Court had decertified the class. *Id.* 445 U.S. at 484 n. 3, 100 S.Ct. at 1259.

15. These provisions were substantially included in both appellees' and Judge Kessler's proposed orders; thus, there can be no question that the District had an opportunity to argue its concerns in the trial court.

the proceeding was in any way irregular, or the particular provisions of the final order at issue were unsupported by the evidence or otherwise unreasonable. The mutually shared premises of the court's authority and the regularity of the proceeding were so strong, and the factual basis for some court-ordered remedy was so completely acknowledged, that Judge Kessler's decision not to prepare findings and a legal opinion in support of her order—until requested by this court to do so once the District had appealed—is understandable.

Repeatedly, we have declined to consider issues on appeal that were not raised before the trial court in criminal and civil litigation, absent "plain error," *Watts v. United States,* D.C.App., 362 A.2d 706 (1976) (en banc) (criminal), or a manifest "miscarriage of justice." *W. W. Chambers, Inc. v. Audette,* D.C.App., 385 A.2d 10, 15 (1978) (civil).[16] Trial judges should be given the opportunity to rectify their errors, thus relieving all parties of the time and financial expense of an appeal. *See generally Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

Nonetheless, to the extent the District challenges the jurisdiction of the trial court to conduct the proceeding, we must resolve the District's claim on appeal. The parties cannot waive subject matter jurisdiction. *American Fire & Cas. Co. v. Finn,* 341 U.S. 6, 17–18, 11 S.Ct. 534, 541–42, 95 L.Ed. 702 (1951); 1 Moore's Federal Practice ¶ 0.60[4] (2d ed. 1980). Moreover, to the extent the District's claims on appeal do not rise to the level of a jurisdictional attack, I believe we should consider them here. This was an extraordinary proceeding, resulting in extensive relief. There is a potential injustice to the District from any sweep of the

court's order that may be excessive. Accordingly, I consider this an exceptional circumstance permitting review of all the District's allegations, to whatever end their assertions may reach. *See Miller, supra* 127 U.S.App.D.C. at 370, 384 F.2d at 322; *In re Elmore, supra* 127 U.S.App.D.C. at 178, 382 F.2d at 127; *Dart Drug Corp. v. Parke, Davis & Co.,* 120 U.S.App.D.C. 79, 89–90, 344 F.2d 173, 183–84 (1965).

By opening a separately-docketed "inquiry into allegations of misconduct against juveniles detained at and committed at Cedar Knoll Institution" and appointing the Public Defender Service to "represent all juveniles detained and committed at Cedar Knoll" for purposes of that inquiry, Judge Kessler clearly perceived this case to be a class action. Although the original four juveniles were the principal witnesses, there were others who addressed their testimony primarily to their own difficulties. I see no problem in a parade of witnesses whose testimony is germane to the allegations of personal harm to the parties to the proceeding, and there is no doubt that there was strong evidentiary support for the allegations properly before the court. Nonetheless, it is impossible to sort out this particular case—and the court's findings did not do so—in a manner justifying an appellate conclusion that the judge limited the order to relief for the benefit of the particular parties properly before her. The jurisdictional limitation on the court's findings and conclusions is not sufficiently clear for affirmance. Like my colleagues, therefore, I would vacate the order. However, I would remand—not dismiss—the case for further proceedings consistent with the foregoing views, for such affirmative relief is encompassed by the court's jurisdiction.[17]

---

16. *See Dunn v. Evening Star Newspaper Co.,* D.C.App., 232 A.2d 293, 297 (1967) (civil); *Bullock v. Young,* D.C.Mun.App., 118 A.2d 917 (1955) (civil); *Chong Moe Dan v. Maryland Cas. Co.,* D.C.Mun.App., 93 A.2d 286, 288 (1952) (civil); *Brooks v. Jensen,* D.C.Mun.App., 73 A.2d 32, 33 (1950) (civil).

17. Although the question of relief is different from the question of mootness, *see Concentrated Phosphate Export Ass'n, supra* 393 U.S. at

203, 89 S.Ct. at 364; *W. T. Grant Co., supra* 345 U.S. at 632, 73 S.Ct. at 897; 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure, § 3533 at 266–67 (1975), the fact that the children no longer are confined could influence the court's decision, on remand, as to what relief is reasonably necessary to protect their individual interests. Declaratory relief may be sufficient. *Compare United States ex rel. Jacobs v. Froehlke,* 156 U.S.App.D.C. 365, 366, 481 F.2d 540, 541 (1973) (habeas corpus

I have covered many pages to reach a result not far from my colleagues. I did so because, in my view, the majority opinion arguably can be read to diminish essential jurisdiction of the Juvenile Branch. As this case illustrates, the class action approach is more workable when relief of such magnitude can be anticipated; and only parties, not judges, can bring class actions. Nonetheless, among its powers the Juvenile Branch of the Family "Division shall have the authority to (i) order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within the agency's legal au-

thority . . . ." D.C.Code 1978 Supp. § 16–2320(a)(5) (quoted at note 8 *supra*). Nothing written in this case should be read to diminish the court's equitable power to do all that is reasonably necessary as to District agencies for the "supervision, care, and rehabilitation" of a child properly before it. D.C.Code 1973, § 16–2320(c).

challenge was moot where prisoner already had served sentence, but habeas petition could be treated as motion for declaratory judgment and resolved).