443 A.2d 13 (1982)
In the Matter of J.A.G.
Appeal of DISTRICT OF COLUMBIA DEPARTMENT OF HUMAN SERVICES.
No. 80-1263.
District of Columbia Court of Appeals.
Argued June 24, 1981.
Decided March 8, 1982.
*14 Richard B. Nettler, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D. C., were on the briefs, for appellant.
Matthew B. Bogin, Washington, D. C., for appellee. Diane M. Smith, Washington, D. C., submitted the brief for appellee.
Before NEWMAN, Chief Judge, and KERN and FERREN, Associate Judges.
NEWMAN, Chief Judge:
The issue presented by this appeal is whether the Family Division of the Superior Court has the authority to order a specific placement for a delinquent juvenile who is on aftercare status, under the custody of the District of Columbia Department of Human Services (DHS), and to order the agency to pay the expenses of that placement. DHS appeals from such an order, which directs that J.A.G. be placed in a private school in Atlanta, Georgia.
I conclude that, though the court properly specified a particular placement as part of its original disposition order, the court had no jurisdiction to order a second placement after the first placement was terminated and the juvenile placed on aftercare. Accordingly, the trial court's order should be overturned.[1]

I
On October 31, 1978, fifteen-year-old J.A.G. pled guilty to malicious destruction of property. He was placed on probation for one year. Shortly thereafter, he ran away from home to California. His parents then placed him in the Highland Hospital at Duke University, where he was to receive treatment for alcoholism. On May 4, 1979, however, he absconded from Highland, and returned to his parents' house. He ran away from home again on May 25, and was arrested the next day in Maryland for carrying a concealed knife. Accordingly, on June 8, 1979, the court revoked J.A.G.'s probation and committed him to the custody of DHS. The court's disposition order specified that J.A.G. was to be placed back at Highland Hospital, but was to be sent to St. Elizabeths until space became available at Highland. The court also directed that J.A.G. could be released on aftercare whenever, in DHS's judgment, he was sufficiently rehabilitated. Four days later J.A.G. absconded from St. Elizabeths. He was returned to custody in mid-July, and then placed at Highland, where he remained until the following spring, with the exception of a one-month period in the fall in which he had run away. By the time this placement ended, J.A.G. had earned a high school equivalency certificate.
On May 5, 1980, the court issued an order "authorizing" DHS to release J.A.G. from Highland. (See note 5 infra.) Accordingly, DHS placed J.A.G. on aftercare status.[2] He *15 spent the summer of 1980 as an out-patient at Highland, and worked as a camp counselor in Hendersonville, North Carolina. At the end of the summer, J.A.G. moved home and enrolled in Alcoholics Anonymous. He decided that he wanted to go to college.[3] In order to do so, however, he needed further special education at the secondary level. (The record indicates that J.A.G. suffered from dyslexia as well as emotional problems.) His parents wanted him to attend Gables Academies in Atlanta, which was willing to accept J.A.G.
On October 9, 1980, the Family Division held an ex parte "review of commitment" hearing,[4] at which J.A.G.'s attorney sought to have DHS pay for the Gables placement. J.A.G.'s aftercare counselor maintained that DHS did not have the funds for such a placement; she had encouraged alternatives within the District of Columbia. Judge Washington ordered the placement on October 14. Meanwhile, on October 12, J.A.G.'s parents flew him to Atlanta to be enrolled at Gables.
On October 20, DHS moved the court to rescind its order, arguing that this court's decision in In re J.M.W., D.C.App., 411 A.2d 345 (1980), left the Family Division without jurisdiction to intervene and order a specific placement. Following a hearing on October 30, Judge Washington ordered DHS to pay J.A.G.'s tuition by November 5, in order to maintain the status quo, since Gables would not keep J.A.G. at the school unless his tuition was paid by that date. The court denied the agency's motion on the merits, on November 3, 1980.[5]

II
When the trial court committed J.A.G. to the custody of DHS, on June 8, 1979, it specifically ordered that J.A.G. be placed at Highland Hospital. In doing so, the court properly acted within its scope of authority; the Family Division of the Superior Court does have the power to designate a particular placement as part of its initial disposition order. See D.C.Code 1973, § 16-2320(c)(1); D.C.Code 1978 Supp., § 16-2320(a)(5); In re J.J., D.C.App., 431 A.2d 587, 591 (1981).
The court subsequently attempted to reassert jurisdiction over J.A.G. on two occasions. First, on May 5, 1980, it "modified" its earlier disposition order to "authorize" DHS to release J.A.G. from Highland.[6] Second, on October 9, 1980, the court held an ex parte commitment "review" hearing, at which J.A.G. requested the placement at issue here. In the latter instance the court acted without jurisdiction.
*16 In J.M.W., as here, the juvenile was on aftercare, which is analogous to parole. See In re J.M.W., supra at 348-49. The trial court in J.M.W. had intervened to revoke the juvenile's aftercare status, and ordered him placed at Oak Hill. This court reversed, holding that once a juvenile is committed to the custody of DHS, the Family Division "relinquishe[s] its authority to determine the appropriate measures needed to insure rehabilitation." Id. at 349. Once custody is transferred, the agency assumes "exclusive supervisory responsibility over the juvenile...." Id. The holding in J.M.W. is dispositive in this case. The Family Division is without jurisdiction to modify a commitment order, as it attempted to do here, in the absence of a "specific legislative mandate." Id. at 346.[7]
Nor can I find any "specific legislative mandate" that might otherwise legitimate the court's order. Appellee has suggested several possible statutory provisions, none of which is applicable here.
First, while the Family Division may retain a veto power over release, if specifically reserved at the time of the original disposition, the trial court did not do so here. See D.C.Code 1973, § 16-2322(a)(1); In re J.M.W., supra at 348 n.3. In fact, the trial court here did just the opposite; it specifically authorized DHS to release the juvenile whenever in the agency's judgment he was sufficiently rehabilitated.
Second, D.C.Code 1978 Supp., § 16-2320(a)(5) likewise fails to provide the necessary "legislative mandate." Section 16-2320(a)(5)(i) permits the Family Division to "order any public agency of the District of Columbia to provide any service the Division determines is needed...." This authority, however, exists only with respect to the initial disposition or commitment order. In re J.J., supra at 591 n.9. Thus it cannot serve as a justification for the orders in this case, which were attempted modifications of the original disposition, made approximately one year later.
Third, appellee has urged that his motion to have DHS pay for the Gables placement be treated as a motion for modification of the commitment order, under D.C. Code 1978 Supp., § 16-2324(b)-(c). I cannot agree. Appellee's motion was not brought pursuant to § 16-2324, nor could it have been. This section requires that the juvenile or his parents first request the agency to terminate its custody over the juvenile. Id. § 16-2324(b). Only if this application to the agency is denied or not acted upon within a reasonable time may the applicant move the court to intervene, on the ground that the child is no longer in need of commitment. Not only did J.A.G.'s parents not apply to DHS for a termination of custody, but there is no indication in the record that they ever wanted J.A.G. to be released from custody; they simply wanted DHS to pay for J.A.G.'s private education.
Finally, I reject appellee's contention that the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1232, 1401, 1405-1406, 1411-1420, 1453 (1976), provides authority for the court's order. The Education Act guarantees each child a "free appropriate public education until age 21." Id. § 1412(2)(B). But the "free" schooling sought by J.A.G.'s parents fails to qualify under the statute in several respects. First of all, it is not "public," i.e., not "under public supervision and direction." Id. § 1401(18)(A). Parents are *17 not entitled to simply choose any private school in the country and demand that their state of residence pick up the tab for their children. Second, this school is not located "in the State involved." Id. § 1401(18)(C) (emphasis added). Third, the Gables placement may not be "secondary" education under the circumstances of this case, since J.A.G. had already attained his high school equivalency certificate. See id. § 1401(10) ("`secondary school' ... does not include any education provided beyond grade 12.") Finally, the sole judicial remedy under the Education Act is a civil suit (in state or federal court), which may only be brought subsequent to an administrative hearing procedure before the local education agency. Id. § 1415. Thus, the Family Division was without jurisdiction under the Education Act.
I do not dispute that the role of the District of Columbia in juvenile cases is one of parens patriae. See Kent v. United States, 383 U.S. 541, 554-56, 86 S.Ct. 1045, 1053-1054, 16 L.Ed.2d 84 (1966); Creek v. Stone, 126 U.S.App.D.C. 329, 332, 334, 379 F.2d 106, 109, 111 (1967). But simply to assert this premise does not answer the question as to which branch of government has the authority to act in the parens patriae role at each stage of the proceedings. See In re J.J., supra at 592-93; In re J.M.W., supra at 348-49. The statutory scheme clearly assigns to the agency the exclusive responsibility for supervising the rehabilitation of the juvenile, once the court has committed the juvenile to the custody of that agency. Id. at 349.
Because no specific legislative mandate authorized the court to modify its disposition order in this case, the court had no jurisdiction to order another placement after custody of the juvenile had been committed to DHS.
Reversed.
KERN, Associate Judge, dissenting.
"The whole thing is a problem of money." (R. 10.) So said the experienced trial judge here during oral argument of the government's motion to rescind his order.[1] So, too, I conclude upon review of the record that money is the root of appeal.
The record reflects that the juvenile with the advice of parents and counsel waived a hearing on the Petition filed in September 1978 (R. 80) and pleaded guilty to malicious destruction of property, viz., more than $200 damages to an auto in the neighborhood where he lived (R. 79, 82.) The court, after ordering a predisposition report prepared by the Department of Human Services (DHS), placed the juvenile on probation and released him to the custody of his parents under various terms and conditions, including his regular attendance at school.[2] (R. 85.)
Despite the fact that there was no reference in such order to treatment in any institution outside the District of Columbia, five months after the court had released the juvenile to the custody of his parents on probation the court's probation officer reported that the juvenile "had absconded from Highlands Hospital where he was receiving treatment for alcohol drinking problems" and "today, he is at the parents ... home...." (R. 90).
The Highlands Hospital is located in Asheville, North Carolina. (R. 91.) According to representations by the juvenile's attorney in her pleadings before the trial court, this particular Hospital, a part of Duke University Medical Center, (R. 97), "addressed many of the [juvenile's] ... emotional and psychiatric problems."[3] The record contains no finding of the need for the juvenile's hospitalization out of the District of Columbia; whether it was proper for the parents to remove him from the District while he was on probation in their custody pursuant to order of the court is not clear.
*18 In any event, the trial court, on request of Corporation Counsel to revoke the juvenile's probation (R. 91), committed him to the custody of DHS and directed DHS to place him "at Duke University Medical CenterHighlands Hospital, Asheville, N.C." (Supp. Record at 2.) The record reflects no objection by DHS to being directed by the Family Division to return the juvenile, now committed to its custody, to a private hospital in North Carolina for continuation of the treatment he had been undergoingapparently because such treatment was at the expense of his parents and their medical insurance carrier.[4]
In October 1979, DHS reported to the court that the juvenile was missing from Highlands Hospital. (R. 98.) The court ordered him taken into custody and then entered a form Order for Release upon Conditions directing once more that he return with his parents to Highlands Hospital in North Carolina on November 16, 1979. (R. 99.) Again, although the juvenile was in the custody of DHS, there is nothing of record denoting an objection by DHS to the court's order directing the juvenile's return by his parents to a North Carolina hospital for treatment.
In October 1980, a judge in the Family Division reviewed the juvenile's commitment. (R. 102.) Two years had then passed since the Petition charging destruction of property and the juvenile's subsequent waiver and plea of guilty. During most of this time the juvenile had been undergoing treatment at an out-of-state medical facility without any objection from the court or DHS. The social worker from DHS advised the court at this hearing (R. 57):
[A]t this time it is felt that he needs more or less a junior preparatory ... to upgrade his level of academies.... He could go to UDC or D.C. Skills Center, the Occupational Industrial Center, but at this time ... he's having a problem with alcoholism.... [H]e has had interviews at the Gable School in Atlanta.... [T]hey are willing to accept him there, and the environment might be more conducive to his continuing his education at that school. Our stand at this point ... is that we have no contract ... with the Gable School, [and] do not have funds for a non-contract facilities. If he were to be placed there we'd have to work ... with D.C. Public Schools, who could share responsibility for tuition....
The juvenile's mother advised the court that the Gables School is "a special school for children with learning disabilities." (R. 60.) The juvenile's attorney pointed out to the court that if he were to go through "the kind of services and programs that we believe Gables offers, he will be able to deal with ... his early emotional problems and subsequent alcoholism. The learning disability is certainly paramount, but these other issues have to be addressed, and none of them can be addressed in isolation." (R. 62.)
Counsel also pointed out to the court (R. 113) that the juvenile's parents "retained the services of Bernice W. Munsey, an educational consultant. Ms. Munsey reviewed all of the information concerning [the juvenile's] background, schooling, medical and psychiatric treatment and made two recommendations, the Gables Academies and Darrow School in New York."
When the court learned that the cost of tuition, room, board and books at Gables School was between eight and nine thousand dollars (R. 62-63), the court concluded (R. 64):
I certainly am going to help [the juvenile] get there, because it takes more than that... to send him out to the Children's Center.
Despite the protestation from the DHS representative that: "We definitely don't have the funds" (R. 60), the court entered an order (R. 102) finding, among others, that:

*19 The juvenile is in need of special services to address his learning disability, his emotional problems, and his alcoholism;
It is in the juvenile's best interest that such services be provided outside of the District of Columbia; and
Gables Academies in Atlanta, Georgia has identified the juvenile as being appropriate for their program.
The court rested its findings (R. 102) upon the representation of counsel and the DHS social worker and "letters from Bernice W. Munsey, Educational Consultant and Bruce L. Kline, Director, Gables Academies."
The court concluded in its Order (R. 103) that DHS place immediately the juvenile at the Gables Academies and "not pay in excess of ... $9,000 for [the juvenile's] placement."
The other opinions promulgated in this case deal at length with a difficult issue, viz., the precise line of demarcation between the authority of the Family Division and that of DHS to protect the welfare of a juvenile entering the D.C. court system after being adjudged delinquent. The difference between these two opinions may ultimately require a decision by the court en banc. However, I approach the instant case upon its unique facts.
First, given this record there can be no dispute that the juvenile is in need both of special education by reason of his learning disability and also of special treatment by reason of his long-standing emotional problems that have manifested themselves in his addiction to alcohol.
Second, there is no showing in this record of any plan proposed by DHS to both educate and treat the juvenile in local facilities as an alternative to the plan presented to the Family Division at the October 1980 hearing by the parent's consultant, Ms. Munsey.
Third, the record is necessarily devoid of evidence of the cost to DHS of its own plan for treatment of the juvenile as compared to the annual cost of his attendance at the Gables Academies. The record reflects only that the DHS representative advised the court that part of the cost of the Gables Academies could be borne by the D.C. Public Schools. (R. 58.)[5]
Finally, since DHS appears to acknowledge that in other cases it has entered into contracts with institutions other than its own for the care of juveniles committed to its custody (R. 58) and since the Family Division's Order committing the juvenile to DHS custody in this case (Supp. Record # 2) expressly authorizes DHS to place him in "private institutions" or "special schools" under subcontract arrangements, there is nothing before the trial court to show why such a contractual arrangement with the Gables Academies was beyond the capability of DHS.
In sum, I am not persuaded that the record before us is sufficiently fleshed out to permit an intelligent review of the trial court's ruling. Accordingly, I would remand for further proceedings designed to elicit the additional information relevant to the continuing custody and treatment of this particular juvenile.
FERREN, Associate Judge, concurring in the result:
I join in the judgment of reversal but not in my colleagues' opinions.

I.
For at least thirty years, District of Columbia law has provided that once the juvenile court (now Juvenile Branch of the Family Division) obtains jurisdiction over a child, that jurisdiction continues until the child becomes 21 years of age or jurisdiction is earlier terminated. See D.C.Code 1973, § 16-2303; D.C.Code 1967, § 11-1551(b); D.C.Code 1961, § 11-907; D.C.Code 1951, § 11-907 (Supp. VII).[1] Judicial decisions *20 over the years accordingly have held that the juvenile court retains jurisdiction to modify or revoke a commitment or probation order in furtherance of its responsibilities to the child and to the community. In re C.I.T. v. C.M.T., D.C.App., 369 A.2d 171, 172 (1977) (under D.C.Code 1973, § 16-2303, Family Division has "continuing jurisdiction... over minors committed by it to DHR, and the periodic reviews necessary to such commitments"); In re Elmore, 127 U.S.App. D.C. 176, 179, 382 F.2d 125, 128 (1967) (where "there has been any significant change in petitioner's condition requiring reevaluation of the initial commitment order, the Juvenile Court has power to shape its decree to reflect the current facts"); In re Lem, D.C.Mun.App., 164 A.2d 345, 348 (1960) ("Congress, realizing that the needs and welfare of a child committed under any conditions fluctuate rapidly, intended that the court have continuing jurisdiction in all child commitment cases in which it had original jurisdiction"); see Matter of an Inquiry Into Allegations of Misconduct Against Juveniles Detained and Committed at Cedar Knoll Institution, Department of Human Resources, D.C.App., 430 A.2d 1087, 1094 (1981) (Cedar Knoll Institution) (Ferren, J., dissenting) (court "still had jurisdiction over" child "who had aftercare status in the custody of his mother" and over child "who had absconded but was subject to an outstanding custody order to return to the Children's Center").
In summary, by virtue of D.C.Code 1973, § 16-2303 and a consistent line of cases interpreting that provision and its statutory predecessors, the Family Division retains general, post-dispositional jurisdiction over the treatment of juveniles. The question, then, is whether other provisions of the District of Columbia Code withhold particular jurisdictional areas from the court's reach.

II.
In In re J.M.W., D.C.App., 411 A.2d 345, 348 (1980), this court noted that the statutory provision establishing the court's dispositional alternatives, D.C.Code 1973, § 16-2320(a)(5), does not specifically provide for "ongoing involvement of the court ... in commitment cases," unlike the provision that expressly authorizes the court "to modify or revoke probation." See D.C.Code 1978 Supp., § 16-2327.
Thus, while the court is specifically granted authority to modify or revoke a dispositional order placing a juvenile on probation, the court is without statutory power to intervene after commitment. In the absence of such an express grant, we find that the court was without authority to revoke petitioner's aftercare status and order his placement at Oak Hill. [J.M.W., supra at 348.]
The court found unpersuasive the argument that "the court has inherent authority by virtue of the doctrine of parens patriae and the general jurisdictional grant of D.C.Code 1973, § 16-2303." Id. The court concluded:
Although this provision [§ 16-2303] clearly allows the court to retain continuing jurisdiction over a juvenile until he reaches the age of majority, it should not *21 be interpreted to be a grant which allows the court to exercise its authority in a manner which is inconsistent with or broader than statutory mandate. To hold that this section provides for judicial modification of a commitment order would extend the powers of the court far beyond that which is expressly delegated by statute. [Id.]
The court nonetheless recognized an exception to "complete autonomy" for an agency to which the court commits a child. It noted that D.C.Code 1973, § 16-2322(a)(1)[2] authorizes the juvenile court to "retain a veto power over release, if specifically ordered at the time of disposition." J.M.W., supra at 348 n.3; see In re J.J., D.C.App., 431 A.2d 587, 591 & n.8, 9 (1981).
Respectfully, I disagree with the foregoing analysis in J.M.W., supra. Given the Family Division's general grant of continuing jurisdiction, D.C.Code 1973, § 16-2303, there is no reason to infer that the express grant of authority in D.C.Code 1978 Supp., § 16-2327 to modify or revoke a probation order somehow negates the court's continuing jurisdiction over a commitment order. The only reason for the inference appears to be the court's belief that, in contrast with a probation order, an order transferring "legal custody" to the agency is a relinquishment of general jurisdiction. J.M.W., supra at 348. To the contrary, I perceive no reason why a transfer of legal custody to an executive department or agency that traditionally assumes responsibility for a delinquent child necessarily eliminates the court's continuing, supervisory jurisdiction over the exercise of that custody. Nor do I understand why there needs to be a more "express" grant of continuing jurisdiction to intervene after commitment than Congress enacted in D.C.Code 1973, § 16-2303especially in view of the decisional law interpreting that provision and its predecessors. See C.I.T., supra; Elmore, supra; Lem, supra. Finally, the court's very authority to condition its disposition by retaining "a veto power over release," J.M.W., supra at 348 n.3; see D.C. Code 1973, § 16-2322(a)(1); note 2 supra, is a confirmation of continuing jurisdiction over the child up to the point of outright release. The fact that the custodian may release the child without court permission, unless the court specifically reserves the right to approve, is merely a legislative recognition of the custodian's presumptive expertise and good judgment; it does not imply that Congress has withheld authority from the court to intervene during the period between commitment and release.
Thus, as I see it, until a juvenile is released unconditionally, the court has continuing jurisdiction to review and intervene, as appropriate, in the child's situationincluding scrutiny of a conditional release status such as aftercare. See ante at 14 n.2. Indeed, as this court recently noted in C.I.T., supra, the Family Division, sua sponte, routinely conducts "periodic reviews" of juvenile commitments to DHR (now DHS)a procedure the court characterized as "necessary" pursuant to the court's "continuing jurisdiction." Id. at 172; see Super.Ct.Juv. R. 32(h).[3]
*22 Contrary to the foregoing analysis, however, J.M.W., supra, is a decision binding on this division as well as on the trial court. See M.A.P. v. Ryan, D.C.App., 285 A.2d 310, 312 (1971). Consequently, I must agree that J.M.W. mandates reversal here, for although the court, in its commitment order, had properly designated J.A.G.'s placement at Highland Hospital and thus retained jurisdiction to enforce that order, it attempted improperly (under J.M.W.) to reassert jurisdiction after DHS had released J.A.G. from the hospital with court permission.

III.
As Chief Judge NEWMAN intimates, see ante at 16, J.M.W. and J.J. leave open a possibility for continuing jurisdiction after the initial commitment, since the juvenile court can "retain a veto power over release" pursuant to § 16-2322(a)(1). J.M.W., supra at 348 n.3; see note 2 supra. This suggests that the Family Division may not lose jurisdiction if it carefully spells out in the initial commitment order all the supervisory authority it wishes to retain over the child's legal custodian, such as DHS, during the period before outright release. See J.J., supra at 591 & n.9. Chief Judge NEWMAN reaffirms, for example, that the court may specify as part of its initial commitment order that DHS shall place the child in a named educational institution. See ante at 16; J.J., supra at 590-91; D.C. Code 1978 Supp., § 16-2320(a)(5)(i); id. 1973, § 16-2320(c)(1). It follows, presumably, that the court has power to monitor the child's progress there. See J.J., supra at 591.
I say "presumably" because J.M.W. and J.J. do not make clear how much supervisory jurisdiction the court can retain under § 16-2322(a)(1) based on the right to provide for initial disposition, coupled with the right to veto release. A possible limitation on an absolute right to reserve continuing supervisory jurisdiction (consistent with J.M.W.) is in the statutory provisions governing modification of commitment orders, D.C.Code 1978 Supp., § 16-2324(b) and (c).[4] Literally, as Chief Judge NEWMAN suggests, ante at 16, these provisions limit a child, parent, or guardian to petitioning for modification or termination of a commitment order only "on the ground that the child no longer is in need of commitment" and only after applying to the custodial agency for "release,"[5] They do not appear *23 to permit petitions to modify concededly necessary commitment. Nonetheless, whatever limitations there may be on a petition by a child, parent, or guardian under § 16-2324, but see note 5 supra, they would not necessarily affect the juvenile court's supervisory jurisdiction, reserved in the initial commitment order pursuant to § 16-2322(a)(1), to act sua sponte.
In short, J.M.W. cannot necessarily be read to preclude the juvenile court from affirmatively retaining whatever supervisory jurisdiction over a child's commitment the court deems necessary, and J.J. can be read to encourage that interpretation of § 16-2322(a)(1).[6] If J.M.W. is to remain the law, however, this question needs a definitive answer, for the supervisory jurisdiction of the Family Division should not be unsettled. Too much is at stake.

IV.
I turn, finally, to the trial court's disposition. In J.M.W., supra, the court was concerned about the court's "impermissible encroachment upon the province of the executive" agency taking legal custody of the child. Id. at 349. The courts, of course, review the actions of executive departments and agencies in countless contexts, the concern being proper deference to the agency, not abdication by the courts. Accordingly, if J.M.W., supra, were not binding on this division, I would see this case as one involving the scope of trial court discretion, not jurisdiction to act.
In the present case, therefore, the trial court should evaluate whether DHS would meet its statutory responsibilities in electing to place J.A.G. "here in the District of Columbia ... [at] UDC or D. C. Skills Center, the Occupational Industrial Center" (coupled with treatment by AA)and in thus declining to pay for J.A.G. at Gables Academies in Atlanta. More specifically, the trial court should inquire into the merits of the contention that DHS, in exercising its discretion here, will not "achieve the minimum conditions required for the District to meet its statutory responsibilities to the particular child before the court," Cedar Knoll Institution, supra at 1097 (Ferren, J., dissenting), namely "`custody care and discipline as nearly as possible equivalent to that which should have been provided him by his parents.'" Id. (Ferren, J., dissenting) (quoting Super.Ct.Juv. R. 2) (footnote omitted).
In the event the trial court answers that DHS has not met its responsibilities to the child, this court, on appeal by the District of Columbia, must evaluate not only whether the court erred as to DHS but also, if it did not, whether the trial court's own alternative remedial order was "reasonably necessary to achieve the court's statutory responsibilities to assure proper `supervision, care, and rehabilitation,' D.C.Code 1973, § 16-2320(c), of the particular children who are parties before the court." Id. at 1099 (Ferren, J., dissenting).
The record does not permit a finding that DHS, in the exercise of reasonable discretion to place J.A.G. in District of Columbia facilities, will "achieve the minimum conditions required for the District to meet its statutory responsibilities." Id. at 1097 (Ferren, J., dissenting). The DHS social worker testified:
Your Honor, J has been under commitment to the Department of Human Services since June 8, 1979. He's had most of his placement during that time at Duke University, Highland Hospital, adolescent. He made a very good adjustment there, and it seems that he's responsive to the program that they had at Duke University. During the summer he was as an outpatient from Duke University, and he was at Camp Penocal (phonetic), where it seemed he was going to be entered into the Blue Ridge Technical College for the fall, but during the summer months, J became somewhat depressed, and started having some other types of problems. Therefore, the school felt at that time that he was nothe could not meet the entering requirements, to do the *24 work at the technical school. He was going to take carpentry and compcabinet making there. He did pass the GD while he was at Duke University, but, at this time it is felt that he needs more or less a junior preparatory, or more work to upgrade his level of academics before entering and he wants to continue with his college education. We have explored possibilities of placement here in the District of Columbia for J to complete his college education, or to upraise his level for the GDthe grade points. He could go to UDC or D. C. Skills Center, the Occupational Industrial Center, but at this time, it's felt as though that he's having a problem with alcoholism, and he's now enrolled in the AA program here in the District of Columbia. Since my report was submitted to you, he has had interviews at the Gable (phonetic) school in Atlanta. It seems as though they are willing to accept him there, and the environment might be more conducive to his continuing his education at that school. Our stand at this point, Your Honor, is that we have no contract with DHSdo not have a contract with the Gable School, do not have funds for a non-contract facilities. If he were to [be] placed there we'd have to work bilaterally with D. C. Public Schools, who could share responsibility for tuition and care for him to be placed there. [Emphasis added.]
Although this testimony established that J.A.G. "could" attend "UDC" or the "D. C. Skills Center, the Occupational Industrial Center," it is not clear that this placement, coupled with enrollment "in the AA program here in the District of Columbia," is sufficiently responsive to his needs to meet statutory requirements.
On the other hand, neither does the record justify a conclusion that the trial court's own alternative remedy, placement at Gables Academies, was "reasonably necessary to achieve the court's statutory responsibilities" to J.A.G. Cedar Knoll Institution, supra at 1099 (Ferren, J., dissenting). In another context (review of treatment in a residential facility), I have discussed the respective responsibilities of the trial and appellate courts in reviewing the actions of DHR (now DHS):
This "reasonably-necessary-for-particular children" standard is, of course, imprecise. When coupled with an abuse-of-discretion standard for appellate review, it would grant considerable leeway to the trial judge. Therefore, given the potential scope of judicial intervention, as well as the need for appropriate sensitivity to the prerogatives of the executive branch of the District government, I would require a judge who proposes to issue a sweeping order to justify it with precision, through detailed findings directed at the necessity for such relief for the particular child concerned. [Id. (Ferren, J., dissenting).]
In the present case, the court ordered J.A.G. placed at the Gables Academies in Atlanta at a cost to the District not to exceed $9,000, based on the following findings:
1. That the respondent is in need of special services to address his learning disability, his emotional problems, and his alcoholism.
2. That it is in the respondent's best interest that the services be provided out-side of the District of Columbia.
3. That the respondent has been interviewed and has visited the Gables Academies facility in Atlanta, Georgia, and that they have identified him as being appropriate for their program.
4. That counsel for respondent quoted from a fee schedule provided by the Gables Academies which states that the tuition cost is $8,460.00 and all additional charges do not exceed eight hundred dollars ($800).
Given the implications of this approach for the public fisc, this is indeed a "sweeping order" that must be justified "with precision through detailed findings." Id. (Ferren, J., dissenting). The trial court provided no such justification.
Accordingly, if the trial court had jurisdiction to order a second placementand, were it not for J.M.W., supra, I would hold *25 that it doesI would join in Judge KERN's call for a remand for further proceedings.

V.
Only because this division is bound by J.M.W., supra, I vote to reverse the court's order for lack of jurisdiction.[7]
NOTES
[1] Since Judge Ferren in his separate opinion also votes to reverse, that is the court's disposition of this appeal.
[2] Appellee asserted at oral argument that J.A.G. was not placed on aftercare when he was released from Highland. I can find nothing in the record, however, indicating that J.A. G.'s status upon release was anything other than aftercare. "Aftercare is a program ... under which juveniles who have been committed to its legal custody are placed back in the community under the supervision of a trained social worker." In re J.M.W., D.C.App., 411 A.2d 345, 346 (1980). Here, upon J.A.G's release, he continued as an out-patient at Highland, while working as a counselor in a nearby camp. Moreover, the agency assigned an "aftercare counselor" to supervise his progress. Clearly, his status was indeed aftercare. Since a release to aftercare is a decision within the agency's discretion, (and the court acknowledged as much in its disposition order of June 8, 1979), the court's order of May 5, 1980, had no legal effect on J.A.G.'s status.
[3] Originally, J.A.G. was to attend Blue Ridge Technical College in Hendersonville that fall.
[4] J.A.G.'s aftercare counselor was present at the hearing, but DHS was not formally notified of the hearing, and was not represented by counsel.
[5] The agency's motion for a stay pending appeal was denied, as was its motion to deem the record remanded so that DHS could seek a contribution order pursuant to D.C.Code 1978 Supp., § 16-2325.

Though J.A.G. is now over 18 years old and is no longer committed to the custody of DHS (and is no longer attending Gables), we conclude that this appeal has not been rendered moot. Were we to assume that a juvenile case could be mooted when the child attains the age of majority and leaves the custody of the agency, the issue here would be "capable of repetition, yet evading review." See Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); In re J.J., D.C.App., 431 A.2d 587, 589-90, n.6 (1981).
[6] Since the court did not retain a veto power over release in its disposition order, see D.C. Code 1973, § 16-2322(a)(1); In re J.M.W., supra at 348 n.3, and indeed explicitly stated that DHS was authorized to release J.A.G. when in the agency's judgment he had been rehabilitated, the May 5, 1980 order was not a modification at all but was legally redundant of the disposition order.
[7] D.C.Code 1973, § 16-2303 is not to the contrary, for it merely provides that the Family Division retains jurisdiction until the juvenile reaches age 21 or jurisdiction is terminated, whichever occurs first. Here, as in In re J.M.W., supra, once the court transfers legal custody of a delinquent juvenile to DHS, the court divests itself of jurisdiction to supervise the juvenile's rehabilitation. The court's jurisdiction may, of course, be recreated or reasserted under certain limited circumstances. See, e.g., D.C.Code 1978 Supp., § 16-2324(b)-(c) (motion for modification or termination of the commitment order following application to the agency); D.C.Code 1973, § 16-2322(a)(1) (court may retain veto over release, in original disposition order); Super.Ct.Juv. R. 32(h) (review to enforce or implement disposition order). But for purposes of § 16-2303, jurisdiction is terminated upon a transfer of custody to the agency.
[1] Government counsel also referred during argument to "a problem with money." (R. 10).
[2] Restitution, in part at least, was also ordered.
[3] The court's Juvenile Branch Diagnostic Unit referred to "the complexities of this case" (Record at 89), but otherwise provides no further details about the juvenile.
[4] The juvenile's counsel represented to the court that the "major financial burden for that placement was assumed by the parents from their own funds and from medical insurance." (R. 113.)
[5] I note that D.C.Code 1981, § 16-2325 authorizes the Family Division to direct the family of the juvenile whose "legal custody is vested in any agency" to pay "in whole or in part" the cost of the "support and treatment" of that juvenile.
[1] D.C.Code 1951, § 11-907 (Supp.VII), provided in part:

When jurisdiction shall have been obtained by the court in the case of any child, such child shall continue under the jurisdiction of the court until he becomes 21 years of age unless discharged prior thereto: Provided, however, That nothing herein contained shall affect the jurisdiction of other courts over offenses committed by such child after he reaches the age of 18.
This provision remained essentially unchanged, see D.C.Code 1961, § 11-907; D.C.Code 1967, § 11-1551(b), until rewritten in D.C.Code 1973, § 16-2303, which is in effect today and provides:
For purposes of this subchapter, jurisdiction obtained by the Division in the case of a child shall be retained by it until the child becomes twenty-one years of age, unless jurisdiction is terminated before that time. This section does not affect the jurisdiction of other divisions of the Superior Court or of other courts over offenses committed by a person after he ceases to be a child. If a minor already under the jurisdiction of the Division is convicted in the Criminal Division or another court of a crime committed after he ceases to be a child, the Family Division may, in appropriate cases, terminate its jurisdiction.
[2] D.C.Code 1973, § 16-2322(a)(1) provides:

A dispositional order vesting legal custody of a child in a department, agency, or institution shall remain in force for an indeterminate period not exceeding two years. Unless the order specifies that release is permitted only by order of the Division, the department, agency, or institution may release the child at any time that it appears the purpose of the disposition order has been achieved. [Emphasis added.]
[3] Super.Ct.Juv. R. 32(h) provides:

REVIEW OF DISPOSITION. If the disposition order involves placement of the child in an institution, hospital, or agency upon specified conditions, upon request of counsel for the child or Corporation Counsel, the Division shall order that a report concerning implementation of the stated conditions be filed with the Division within 30 days after entry of the dispositional order, and a copy sent to counsel. If such report does not reflect full implementation of the original dispositional order, counsel for the child may request that the Division set a date for a prompt hearing and order notice sent to all parties, including the institution, hospital or agency in whose custody the child was placed by the dispositional order.
As noted in the comment to Rule 32, "[s]ection (h) is designed to provide a means of determining whether dispositional orders are in fact implemented."
[4] D.C.Code 1978 Supp., §§ 16-2324(b) and (c) provide:

(b) A child who has been committed under this subchapter to the custody of an institution, agency, or person, or the parent or guardian of the child, may file a motion for modification or termination of the order of commitment on the ground that the child no longer is in need of commitment, if the child or his parent or guardian has applied to the institution or agency for release and the application was denied or not acted upon within a reasonable time.
(c) The Director of Social Services shall conduct a preliminary review of motions filed under subsection (b) and shall prepare a report to the Division on the allegations contained therein. The Division may dismiss the motion if it concludes from the report that it is without substance. Otherwise, the Division, after notice, shall hear and determine the issues raised by the motion and deny the motion. Or enter an appropriate order modifying or terminating the order of commitment, if it finds such action necessary to safeguard the welfare of the child or the interest of the public.
[5] This literal interpretation presents several problems. First, there is a facial inconsistency in permitting a petition for "modification" only on the ground of no need for commitment and a request for outright "release." Second, D.C. Code 1978 Supp., § 16-2324 was intended to "establish a procedure for modifying and terminating court orders in somewhat greater detail" than its predecessor, D.C.Code 1967, § 16-2309. Hearings on S. 2981 Before the Sen. Comm. on the District of Columbia, 91st Cong., 1st Sess. 1806 (1969) (statement of Donald E. Santarelli). There appear to be no relevant substantive differences between the two statutes, and the broad language of the case law construing the statutes over the years does not limit the court's power to "modify" to rulings on petitions for "release." As a practical matter, moreover, if there must be an application for "release," any petition for modification surely will contain that request, coupled with a request for modification as a fallback. Thus, any such limitation on a petition for release would be easy to get around at the cost of a makeweight argument.
[6] In disagreeing with J.M.W., I personally find that D.C.Code 1973, § 16-2303 permits continuing jurisdiction even when the court makes no express reservation. See Part II, supra.
[7] Before this opinion could be published, the current statutory provisions were recodified in a new 1981 District of Columbia Code; e.g., D.C.Code 1981, § 16-2303. See note 1 supra.