### In re Michael MYRICK.

### No. 85–FM–245.

District of Columbia Court of Appeals.

Argued May 18, 1987.
Decided May 20, 1993.

Harry J. Fulton, Public Defender Service, with whom James Klein and Laurie B. Davis, Public Defender Service, Washington, DC, were on the brief, for Michael Myrick, and also filed a supplementary brief.

Charlotte Brookins–Pruitt, Asst. Corp. Counsel at the time the brief was filed, with whom James R. Murphy, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for the District of Columbia. John Payton, Corporation Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Susan S. McDonald, Asst. Corp. Counsel, Washington, DC, at

---

the time the brief was filed, filed a supplementary brief for the District of Columbia.

Before FERREN, Associate Judge, and NEWMAN * and MACK,** Senior Judges.

FERREN, Associate Judge:

In December 1984, the trial court ordered the involuntary civil commitment of Michael Myrick at Saint Elizabeths Hospital pursuant to D.C.Code § 21–545 (1989).[1] The court concluded that Myrick suffered from a mental illness and consequently was likely to injure himself if allowed to remain at liberty. *See id.* A month later, the court decided that Saint Elizabeths could not meet Myrick's treatment needs and that the only facility capable of doing so was the Brown School's Ranch Treatment Center in Austin, Texas. The court ordered the District of Columbia to arrange for Myrick's placement at the Brown School and to bear the costs of his treatment. The District appealed the court's order on the ground that the District is not liable for the costs of Myrick's care. The District further contended that, even if it must bear the costs of caring for Myrick, the court had no authority to order his placement at a facility outside the District.

After oral argument, we ordered the parties to file supplementary briefs addressing two questions: (1) whether the case was affected by the opinion and order of Judge von Kann in *In re D.W.G.*, 115 Daily Wash. L.Rptr. 2097 (D.C.Super.Ct. June 26, 1987), and (2) whether the case was moot. Judge von Kann's order in *D.W.G.* made factual findings severely critical of the Brown School, pointing out serious problems concerning misdiagnosis and mistreatment of patients occurring at the facility, but, having no reason to do so, did not specifically address Myrick's placement there. In their briefs the parties agreed that Judge von Kann's opinion and order in *D.W.G.* had no effect on the question of the costs of Myrick's care and that accordingly the case was not moot.

Myrick's counsel, however, suggested a remand of the record for the trial court to reconsider its disposition order placing Myrick at the Brown School. On May 26, 1988, we sent the case back to the trial court for that purpose. We further ordered the District to show cause why it had not sought reimbursement for Myrick's care from the federal government as Judge Block had ordered it to do in 1987.

More than three years passed before an order issued from the Superior Court, on September 16, 1991, informing us of a hearing in the matter. At that hearing before Judge Hess, both parties indicated that, "because the Brown School is not a long-term care facility and [Myrick had] received the maximum benefits which the School has to offer," Myrick would soon be moved from the Brown School. The order further indicated that the District had referred the matter of federal government reimbursement for Myrick's treatment to the Property and Collections Division of the D.C. Department of Human Resources, where the matter was pending.

On October 25, 1991, we ordered the parties to show cause why, in light of the intention to transfer Myrick from the Brown School, the case should not be dismissed as moot. Although Myrick's counsel did not object to dismissal on that ground, the District pointed out that, because Myrick was still at the Brown School and because District taxpayers had borne, and would continue to bear, the costs of Myrick's treatment in whatever facility he was placed, the District's appeal of the trial court's original order imposing those costs on the District was not moot. Concluding that cause had been shown as to why the case should not be dismissed as moot, on

---

* Judge NEWMAN was an Associate Judge at the time of argument. His status changed to Senior Judge on March 11, 1991.

** Judge MACK was an Associate Judge at the time of argument. Her status changed to Senior Judge on December 1, 1989.

1. This opinion cites to the most recent D.C.Code provisions. The parties have not informed us, and we are not aware of, any recent changes to the applicable statutory schemes that would raise an issue of retroactive application to either the time of Myrick's initial commitment or the trial court's final order.

January 8, 1992, we ordered the parties to file supplemental briefs, since the original briefs in the case had been filed in 1986.

The parties responded with updated briefs. According to the brief for Myrick filed April 3, 1992, Myrick is still at the Brown School, a fact reenforcing our earlier ruling that this case is not moot. For the reasons that follow, we affirm the trial court's original order imposing the costs of Myrick's care on the District of Columbia.

I.

Until May 1983, then 20-year-old Michael Myrick lived with his mother, a German national, and with his father, who was a noncommissioned officer in the United States Army stationed in what was then the Federal Republic of Germany. Myrick went into a coma in May 1983 and was admitted to an American military hospital in West Germany. On the advice of his physicians, Myrick's parents consented to have their son flown to Washington and admitted to Walter Reed Army Medical Center. Soon after his admission into Walter Reed, his doctors transferred Myrick to Saint Elizabeths Hospital. Myrick was committed to Saint Elizabeths' care under the emergency hospitalization provisions of D.C.Code §§ 21–521 through –528 (1989 & 1992 Supp.). On July 1, 1983, acting on the petition of the Superintendent of Saint Elizabeths, the Superior Court extended Myrick's emergency commitment for an additional seven days pursuant to D.C.Code § 21–523. A week later, the Superintendent petitioned the court to begin proceedings for Myrick's indefinite involuntary commitment under D.C.Code §§ 21–541 through –551 (1989).

While the civil commitment proceedings were pending, Myrick remained at Saint Elizabeths. Myrick had been diagnosed initially as suffering from a psychiatric condition. Upon suspicion that Myrick's condition was actually neurological rather than psychiatric, the staff at Saint Elizabeths transferred Myrick, with his father's consent, to the William A. White Program, located on the campus of Saint Elizabeths but in fact a separate division of the National Institutes of Mental Health.[2] The purpose of Myrick's transfer was to allow the staff of the White Program to conduct a battery of highly sophisticated neurological tests in order to make a precise diagnosis and an informed recommendation concerning Myrick's future care. The staff of the White Program concluded, after several months of testing, that Myrick was the victim of an extremely rare herpes encephalitis which resulted in brain trauma not unlike the sort associated with strokes, car accidents, or gunshot wounds. In addition, Myrick had suffered hearing impairment as a result of his illness. Because his neurological condition was unlikely to be improved by any psychiatric treatment provided by Saint Elizabeths, the staff recommended that Myrick be placed in a rehabilitative program at the Ranch Treatment Center of the Brown School in Austin, Texas.

In the meantime, the Commission on Mental Health had been conducting periodic examinations of Myrick pursuant to the requirements of D.C.Code § 21–542. Between July 1983 and November 1984, the Commission held a number of hearings and issued several reports on Myrick's condition. In its final report, the Commission concluded that because of severe mental illness, Myrick would be a danger to himself if not hospitalized but that Saint Elizabeths could not "adequately treat" him. The Commission recommended that Myrick be transferred to the Ranch Treatment Center of the Brown School, which the Commission found capable of providing for his care and rehabilitation. The Commission recommended that the District of Columbia bear the costs of Myrick's treatment at the Brown School.

---

**2.** While Myrick's commitment proceeding was pending, the federal government, in part through the National Institutes of Mental Health, operated Saint Elizabeths. *See* D.C.Code § 32–621(a)(4)(G) (1988). Congress has since transferred responsibility for the oper-
ation of Saint Elizabeths to the District of Columbia by enactment of the "Saint Elizabeths Hospital and District of Columbia Mental Health Services Act," D.C.Code §§ 32–621 through –628 (1988 & 1992 Supp.) (commonly referred to as the "Transfer Act").

After receiving the Commission's report, the trial court held hearings to determine whether Myrick should be committed for an indefinite period and what conditions should govern such commitment, according to the standards set forth in D.C.Code § 21–545. The court ordered Myrick hospitalized, finding that he would be a danger to himself if he were at liberty. In its final order of January 28, 1985, having concluded that it had the statutory authority to order Myrick to be hospitalized at a facility other than Saint Elizabeths if another placement would serve the best interests of the patient and the public, the court ordered the District of Columbia to arrange for Myrick's transfer to the Brown School. The court ordered the District to bear the costs of Myrick's treatment and to seek reimbursement from the United States. Myrick was transferred to the Ranch Treatment Center of the Brown School in Austin, Texas in September 1985.

## II.

■ The question we now face is whether the trial court was correct in ordering the District to bear the costs of Myrick's treatment. The trial court based its order on its finding that Myrick was a resident of the District at the time of his commitment. The District argues that it is not liable for those costs because Myrick was not a resident of the District, and that his physical presence in the District because of his hospitalization here did not make him a resident. The District maintains that Myrick, when he entered the District, was and remained a resident of his native Germany. We believe that the issue of Myrick's residency is irrelevant to whether the District must bear the costs of his treatment at Saint Elizabeths, the Brown School, or elsewhere. Under the applicable law, the District of Columbia has an obligation to pay the costs of medical treatment of one whom the District has involuntarily civilly committed—in other words, of one whom the District has deprived of liberty—whether or not that individual is a resident, until such time as another person or jurisdiction assumes responsibility for those costs.

## A.

The law popularly known as the "Ervin Act" clearly provides that, when properly petitioned, the Superior Court must order the commitment of a person found to be a danger to self or others because of mental illness. D.C.Code §§ 21–501 through –592 (1989 & 1992 Supp.). The Ervin Act permits the transfer of a nonresident committee to his or her home state only "if an appropriate institution of that State is willing to accept" the committee. D.C.Code § 21–551. The statute does not permit the Superior Court to release a nonresident committee unless and until another jurisdiction has accepted responsibility for the committee's care; in the absence of another jurisdiction's acceptance of the committee, the District may not release the patient from its care.

In addition to the provisions of the Ervin Act concerning hospitalization of the mentally ill, the District of Columbia is a party to the Interstate Compact on Mental Health,[3] codified at D.C.Code §§ 6–1801 through –1806 (1989) (the Compact). The Compact clearly recognizes that an individual who is mentally ill and in need of treatment is entitled to receive mental health treatment in the jurisdiction in which he or she is physically present, without regard to residency. Article III(a) of the Compact provides:

> Whenever a person physically present in any party state shall be in need of institutionalization by reason of mental illness or mental deficiency, he [or she] shall be eligible for care and treatment in an institution in that state irrespective of his [or her] residence, settlement or citizenship qualifications.

This is based on the provision in Article I of the Compact that "the necessity of and desirability for furnishing [mental health] care and treatment bears no primary rela-

---

**3.** The District of Columbia is expressly included in the Compact's definition of "state." D.C.Code § 6–1801, Article II(h) (1989).

tion to the residence or citizenship of the patient" but, rather, that "the controlling factors of community safety and humanitarianism require that facilities and services be made available for all who are in need of them." *See Greenberg v. Barbour*, 322 F.Supp. 745, 747 (E.D.Pa.1971) (stating that under Interstate Compact on Mental Health person's residence "is of no importance" in determining obligation of state to provide care); *Board of Chosen Freeholders v. McCorkle*, 98 N.J.Super. 451, 237 A.2d 640, 643 (Ct.Law Div.1968) ("[I]nsofar as the commitment of a mentally ill person is concerned, residence is of no significance.").

In theory, the residence of a committee may be relevant to whether the District properly bears ultimate responsibility for his or her long term care. The Compact does not preclude party states from agreeing to transfer patients from one state to another. Its terms, therefore, are consistent with the Ervin Act's provision that the District may seek to transfer a non-resident committee to that patient's home state. *See* D.C.Code § 21–551. Moreover, just as the District may seek to compel a patient's family or estate to pay for his or her hospitalization, *see* D.C.Code § 21–586, the District may seek reimbursement for the costs of Myrick's care from the United States in the event that the federal government is liable for the patient's care. *See* D.C.Code § 32–628(b)(1)(A) (1988). But the Compact ensures that the District may not avoid financial responsibility by sending a mentally ill person to another state without first obtaining the consent of the receiving state to accept that patient. Similarly, the District may not avoid the financial burden of caring for a mentally ill committee simply because it believes the federal government is ultimately responsible for that care under federal law.[4]

Congress transferred responsibility for the operation of Saint Elizabeths Hospital from the federal government to the District of Columbia by enactment of the "Transfer Act," D.C.Code §§ 32–621 through –628, effective October 1, 1985. *See supra* note 2. The financing provisions include the following:

> Beginning on October 1, 1987, and in each subsequent fiscal year, the appropriate federal agency is directed to pay the District of Columbia the full costs for the provision of mental health diagnostic and treatment services for.... [a]ny individual referred to the system pursuant to a federal statute or *by a responsible federal agency* [.]

D.C.Code § 32–628(b)(1)(A) (emphasis added). The District cites this provision to demonstrate that the federal government is ultimately responsible for Myrick's care. But the District misses the provision's underlying premise: the District is responsible for providing the care; it is only by virtue of the District's caring for the patient that the federal government is required to reimburse the District for its services. That this must be so is made clear by a subsequent provision of the same Code section:

> The responsibility of the United States for the cost of services for individuals [referred to the system by a federal agency] *shall not affect the treatment responsibilities* [of] the District of Columbia under the Interstate Compact on Mental Health.

D.C.Code § 32–628(b)(2) (emphasis added). As the District has conceded in its supplemental brief, "[h]ad the care at Saint Elizabeths been adequate for his needs at the time of commitment, Mr. Myrick unquestionably would have been cared for there. It was only because Saint Elizabeths was

---

**4.** To show that the United States is ultimately responsible for the costs of Myrick's care, the District appears to rely on the failure of the United States to dispute the District's position that Myrick is not a D.C. resident and on the failure of the United States to file a brief in this case. Inexplicably, however, the United States has not been joined as a party to this action. Absent joinder of the federal government in this lawsuit, the United States cannot be faulted for not having responded to any position the District has taken. We reiterate, however, that Judge Hess has indicated, in his order after remand, that the District has referred the matter of federal reimbursement to the Property and Collection Division of the D.C. Department of Human Resources.

deemed not adequate that the court ordered treatment at the Brown School." Thus, the District has admitted that it is responsible for providing Myrick's care and that it was unable to provide appropriate care at Saint Elizabeths. We do not understand why the inadequacy of Saint Elizabeths for Myrick's treatment needs and his consequent transfer to the Brown School should relieve the District of its "treatment responsibilities."[5] *Id.* The District's alleged right to reimbursement from the United States is another matter entirely—a matter which is not before this court.[6]

**B.**

The District focuses, nonetheless, as did the trial court, on the issue of Myrick's residency. Myrick left the care of Saint Elizabeths at the urging of the staff there and voluntarily entered the William A. White Program of the National Institutes of Mental Health, located on the Saint Elizabeths campus, more than a year before he was civilly committed by Judge Block. The trial court relied both on the Commission's finding that Myrick was a resident and on Myrick's voluntary participation in the William A. White Program to conclude that his stay in the District was "more than a temporary sojourn," *District of Columbia v. H.J.B.,* 359 A.2d 285, 291 (D.C.1976) (internal quotation marks omitted), and to find that Myrick was indeed a resident. The trial court relied on our decision in *H.J.B.,* in deciding that Myrick was a District resident. In *H.J.B.,* we considered the District's responsibility for the treatment of a 14–year–old severely retarded and mentally ill Korean orphan, who was a "resident" of the District only by virtue of her connection with an adoption committee based

here. Although we determined that the young Korean child was indeed a resident of the District and hence entitled to appropriate medical care, we also stated that to impose a residency requirement on the District's civil commitment laws would "be so unjustifiably discriminatory as to constitute a violation of the Fifth Amendment right to due process." *Id.* at 290–91. While we do not disagree with that principled statement, we need not reach the residency or the constitutional issues because of the plain language and requirements of the applicable statutes—the Ervin Act and the Interstate Compact on Mental Health—outlined above.

**III.**

■ Finally, the District argues that, irrespective of Myrick's residency, the trial court had no authority to order the District to pay for Myrick's care outside the District of Columbia. We reject the District's position.

Both the language and the legislative history of the Ervin Act make clear that its major purpose is "to protect the constitutional rights of certain individuals who are mentally ill, [and] to provide for their care, treatment, and hospitalization" in the District of Columbia. S.REP. No. 925, 88th Cong., 2d Sess. 1 (1964); *see also id.* at 12; H.R.REP. No. 1833, 88th Cong., 2d Sess. 6 (Ervin Act "recognize[s] this moral right to treatment"); *In re Kossow,* 393 A.2d 97, 102 (D.C.1978); *Rouse v. Cameron,* 373 F.2d 451, 452–56 (1966); *In re Jones,* 338 F.Supp. 428, 429 (D.D.C.1972). Moreover, the Ervin Act was explicitly intended "to revise the procedures for the hospitalization of the mentally ill in the District of Columbia." H.R.REP. No. 1833, at 2. We

---

5. The intention of the Interstate Compact on Mental Health was to ensure that persons in situations like Myrick's would not be denied appropriate medical care based on their residency:

Many states have detailed statutory schemes covering the admission, treatment, and transfer of nonresident patients. These provisions have undergone considerable change over the years: whereas earlier most of them did no more than bar treatment of nonresidents and call for mandatory transfer, today many of

the laws defer to interstate mental health compacts ... providing for the retention and treatment of nonresident patients and for their transfer only when it is humane and medically responsible to do so.

SAMUEL JAN BRAKEL, JOHN PARRY & BARBARA A. WEINER, THE MENTALLY DISABLED AND THE LAW 204 (3d ed. 1985) (footnote omitted).

6. We note, however, that nothing prevents the District from seeking to transfer Myrick to the care of the federal government.

conclude, therefore, that the Ervin Act governs the scope of the trial court's authority in this case to order treatment, as well as the responsibility for payment, wherever that treatment may be available, including—if necessary—placement in a facility outside the District of Columbia.

More specifically, D.C.Code § 21–545(b) provides that, once an individual is found to be mentally ill and, as a consequence, likely to injure self or others, "the court may order his [or her] hospitalization for an indeterminate period, or order any other alternative course of treatment which the court believes will be in the best interests of the person or of the public." This broad grant of authority is not conditioned upon the identity of the person or authority requesting the commitment (in this case the Superintendent of Saint Elizabeths). *Cf. Kossow,* 393 A.2d at 102–03 & n. 4 (structure and purpose of Ervin Act leaves room for private civil commitment actions). Moreover, the District has not challenged the trial court's findings that (1) Myrick cannot receive adequate treatment at Saint Elizabeths or at any other facility in the District and that (2) the only suitable placement for Myrick was the Brown School. Finally, as Judge Bazelon stated in *Covington v. Harris,* 419 F.2d 617, 623–24 (1969), "[i]t makes little sense to guard zealously against the possibility of unwarranted deprivations prior to hospitalization, only to abandon the watch once the patient disappears behind hospital doors." Accordingly, not only does the court have "the authority to explore alternative facilities for treatment and treatment plans, both outside Saint Elizabeths Hospital and within the hospital complex," but also Saint Elizabeths "has the obligation to bear the burden of exploration of alternatives." *In re Jones,* 338 F.Supp. at 429 (internal citation and emphasis omitted). To hold, as the District urges, that the Superior Court may not order the District to pursue and pay for treatment outside its geographical boundaries when appropriate treatment cannot be provided within the District would, in this case, nullify the Ervin Act's guarantee of adequate treatment. The Ervin Act guarantees Myrick adequate treatment and

the District concedes that he cannot receive adequate treatment in the District. The only logical conclusion, therefore, is that Myrick is entitled to, and thus the court may order, adequate treatment elsewhere.

The District argues, alternatively, that the Ervin Act's provision authorizing the District to seek reimbursement for expenses incurred in treating mentally ill persons, D.C.Code § 21–586, precludes the court from ordering the District to pay for treatment outside the District of Columbia. Section 21–586(a) provides that the District may seek reimbursement for the costs of "the mentally ill person's maintenance, including treatment, in a hospital in which the person is hospitalized under this chapter." The District argues that, because § 21–501 of the Ervin Act defines both "private hospital" and "public hospital" as a "hospital or institution, or part thereof, in the District of Columbia," the Act contemplates only institutional care within the geographical boundaries of the District.

In light of the sweeping nature of § 21–545(b), however, authorizing any "course of treatment which the court believes will be in the best interests of the [mentally ill] person or of the public," we cannot accept the District's narrow interpretation. First, § 21–586 does not purport to address the scope of the court's authority to order treatment; rather, it addresses only the narrow question of the District's right to recoup its expenses. Second, the terms "public hospital" and "private hospital" appear to be relevant only in differentiating between the standards for admission of emergency patients and of voluntary or nonprotesting patients. While a public hospital "shall" admit those in need of psychiatric care, a private hospital may but is not compelled to do so. D.C.Code §§ 21–511, –513. We do not believe that, by its use of the term "hospital" in § 21–586, Congress intended to limit the scope of the court's authority under § 21–545(b) to ensure a mentally ill person's adequate treatment if the court finds that adequate treatment is not available within the District.

We find additional support for our conclusion that the Superior Court has authori-

ty under the Ervin Act to order treatment outside the District in analogous cases involving the Family Division's authority to order the D.C. Department of Human Services (DHS) to place delinquent juveniles in treatment facilities outside the District. Acknowledging the differences between the so-called "Juvenile Act,"[7] D.C.Code §§ 16–2301 through –2338 (1989 & 1992 Supp.), and the Ervin Act, we note important similarities between the two statutes. For example, care and treatment are the focus of the Ervin Act; similarly "the overriding goal of the District's Juvenile Act [is] to promote the care and rehabilitation of the juvenile." *See In re A.A.I.*, 483 A.2d 1205, 1209 (D.C.1984). Furthermore, like the Ervin Act, the Juvenile Act does not explicitly authorize the Family Division of Superior Court to order DHS to place juveniles in facilities outside the District of Columbia; rather, it allows the court to order "[c]ommitment of the child for medical, psychiatric, or other treatment at an appropriate facility on an in-patient basis if ... the Division finds that confinement is necessary to the treatment of the child." D.C.Code § 16–2320(a)(4); *see id.* at –2320(c)(1). We have held that these provisions enable the Family Division to order DHS to place a juvenile delinquent in a specific program outside the District of Columbia. *See A.A.I.*, 483 A.2d at 1209 (upholding trial court's placement of juvenile in private residential facility in Annapolis, Maryland); *In re J.A.G.*, 443 A.2d 13, 15 (D.C.1982); *id.* at 23–24 (Ferren, J., concurring); *see also In re C.W.M.*, 407 A.2d 617, 624 n. 16 (D.C.1979) ("The [Superior Court] has broad discretion to order the treatment it deems to be in the child's best interest.").

In light of the express purposes of the Ervin Act, we can only conclude that it, like the Juvenile Act, authorizes the Superior Court to order Myrick's treatment in a program located outside the District of Columbia when the court has found that no adequate treatment facility exists within the geographical borders of the District. The court, accordingly, is authorized to or-

der the District to pay for this treatment. Nothing in this opinion should be construed to mean that the District may not make every effort to recover such costs from any party—including the federal government—it believes to bear financial responsibility for Myrick's care. *See* D.C.Code §§ 21–586 and 32–628(b)(1)(A); *supra* note 4.

*Affirmed.*

MACK, Senior Judge, concurring:

While I concur in Judge Ferren's opinion, I write separately only to reemphasize that international considerations coupled with the unique status of the District of Columbia, make this tragic tableau a set of circumstances capable of repetition (that should not evade review in any appropriate forum).

NEWMAN, Senior Judge, dissenting:

This is an old case. I have no desire to delay it further. Thus, I say only that I find nothing in law or logic that permits the Superior Court to compel the taxpayers of the District of Columbia to pay for the out-of-state treatment of one with so tenuous a relationship to the District of Columbia as Michael Myrick has.

---

7. The term "Juvenile Act" is used in our case-law, although not in the D.C.Code. *See, e.g., In* *re A.A.I.*, 483 A.2d 1205, 1209 (D.C.1984).